LESLIE CAROTHERS, COMMISSIONER OF
ENVIRONMENTAL PROTECTION *v.*
THOMAS CAPOZZIELLO ET AL.
(13745)
(13746)
(13747)
(13748)
(13749)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued February 7—decision released May 22, 1990

*Gary A. Mastronardi,* for the appellants-appellees in the first four cases and the appellees in the fifth case (named defendant et al.).

*Robert B. Teitelman,* assistant attorney general, with whom, on the brief, was *Clarine Nardi Riddle,* attorney general, for the appellee-appellant in the first four cases and the appellant in the fifth case (plaintiff).

SHEA, J. These cases, alleging various improprieties in the disposal of building demolition debris, were brought by the plaintiff, Leslie Carothers, the commissioner of environmental protection (commissioner), against the defendants, Thomas Capozziello, Bridgeport Wrecking Company, Inc., and Bridgeport Etc., Inc. (defendants),[1] and were consolidated for trial before the *Hon. John M. Alexander,* state trial referee, exercising the powers of the Superior Court. Seeking, inter alia, injunctive relief and civil penalties pursuant to General Statutes § 22a-226,[2] the commissioner alleged: (1) in the first case, that the defendants had (a) violated the terms of a final consent order entered into between herself and the defendants and (b) oper-

---

[1] The defendant Thomas Capozziello is the principal owner and operator of the two corporate defendants. The defendants are engaged in the building demolition business. In the interest of clarity and uniformity throughout this opinion, the corporate defendants will be referred to as if they were natural persons.

[2] "[General Statutes] Sec. 22a-226. PENALTY. Any person who violates a final order of the commissioner shall be liable for a penalty not to exceed ten thousand dollars per day, commencing the tenth day after the expiration of the time fixed for taking preventive or corrective measures in the final order. The penalty may be collected in a civil action in the superior court for the judicial district of Hartford-New Britain, and shall be fixed by the court. In addition, the commissioner may request the attorney general to institute a civil action in the superior court for the judicial district of Hartford-New Britain for temporary and permanent injunctive relief to prevent any further violation of the order. All actions brought by the attorney general pursuant to this section shall have precedence in the order of trial as provided in section 52-191. Said court shall have the power to grant such injunctive relief upon notice and hearing. No penalty shall be imposed during the time when a hearing or appeal pursuant to section 22a-225 is pending." This statute was amended, effective October 1, 1989, by No. 89-270 of the 1989 Public Acts.

ated a solid waste facility, as defined in General Statutes § 22a-207 (4),[3] without a permit "by arranging for the dumping of wood and other demolition waste" on property in the city of Bridgeport; and (2) in the third case, that the defendants had failed to, or would not, in the future, comply with several provisions of a final decision and order, issued by the commissioner, related to the disposal of demolition waste on property in the city of Bridgeport.[4] In both cases, the trial court rendered judgment in favor of the commissioner, from which the defendants have appealed and the commissioner has cross appealed.

In the second, fourth and fifth cases, the commissioner alleged that the defendants had "dumped wood and other demolition waste" and had operated a solid waste facility, as defined in § 22a-207 (4), on property not owned by the defendants in the towns of Trumbull and Ansonia and the city of Bridgeport, respectively. An amended prayer for relief in each case requested that the trial court order the imposition of civil penalties pursuant to General Statutes § 22a-250 (c) and (e).[5]

---

[3] General Statutes § 22a-207 (4) provides: " 'Solid waste facility' means any solid waste disposal area, volume reduction plant, resource recovery facility or biomedical waste treatment facility operated by any municipal or regional authority or any person if such area, plant or facility handles more than five tons a year of solid waste or any amount of biomedical waste . . . . " This statute was amended by No. 88-341 of the 1988 Public Acts and by No. 89-38b of the 1989 Public Acts.

[4] The owners of the properties upon which the alleged disposal had occurred, Consolidated Rail Corporation and United Illuminating Company, were named as defendants in the third action, but are not parties to the appeal.

[5] The amended prayers sought relief pursuant to General Statutes §§ 22a-6 and 22a-250 (c) and (d), as amended by § 4 of No. 87-531 of the 1987 Public Acts. After this amendment, § 22a-250 (c) provided: "No person shall dump, as defined in subdivision (12) of section 22a-248, any material upon any public property in the state or upon private property in this state not owned by him whether from a vehicle or otherwise, except when such property is designated by the state or any political subdivision thereof for dumping and such person is authorized to use such property or such property is a

In the second and fourth cases the trial court rendered judgment in favor of the commissioner, from which the defendants have appealed and the commissioner has cross appealed. In the fifth case the trial court rendered judgment in favor of the defendants, from which the commissioner has appealed. We find error on the appeals in the second and fourth cases, and no error on the appeals in the first, third and fifth cases. With respect to the cross appeals on the first and third cases, we remand for further articulation concerning the stay of execution of the judgment.

I

The trial court found the following facts relating to the first and third cases involving the property in Bridgeport. The commissioner's allegations concerned the defendants' placement of demolition waste on property owned by the Consolidated Rail Corporation (Conrail) and on adjoining property leased by the defendants for use in their demolition business. Both parcels were located on Singer Avenue, in the city of Bridgeport. After the defendants had completed demolition of a building, the generated debris was often brought to the Singer Avenue properties rather than to a certified landfill. Portions of this debris were then transported to other locations, when and if such locations were found by the defendants. The trial court noted that the

licensed facility for such purpose. The commissioner or the municipality in which such dumping occurs may, upon complaint or on their own initiative, investigate any violation of this subsection. If the commissioner finds that any person has violated this subsection, said commissioner may issue an order pursuant to section 22a-225 to remove material dumped in violation of this subsection to a solid waste facility approved by the commissioner." This statute has been amended, effective October 1, 1988, by No. 88-320 of the 1988 Public Acts.

After amendment by No. 87-531 of the 1987 Public Acts, § 22a-250 (e) now provides in part: "Any person who violates subsections (c) and (d) of this section shall be liable for a civil penalty of not more than ten thousand dollars for each day such violation continues."

"accumulation of demolition debris at Singer Avenue at the [time of trial could] be described as tremendous," and, after viewing the property in question, that the debris was "very high, unsightly, and [had] been found by the Commissioner to cause imminent and substantial danger to the environment." Water supply and sewer lines belonging to United Illuminating Company, running under a portion of the Conrail property by virtue of an easement, were damaged as a result of the accumulation of demolition debris. Evidence was presented that the leaching effect of the debris would affect groundwater in the area. Finally, the trial court found that some of the debris on the Conrail property had been deposited by persons other than the defendants, but concluded, nevertheless, that such debris was "of minor consequence," and that it was "not unfair to require [the defendants] to take the entire responsibility" for all of the debris.

As a result of these activities, the commissioner, on February 22, 1988, issued two orders to the defendants pursuant to General Statutes § 22a-7.[6] The order

[6] "[General Statutes] Sec. 22a-7. CEASE AND DESIST ORDER, SUBSEQUENT HEARING. The commissioner, whenever he finds after investigation that any person is causing, engaging in or maintaining, or is about to cause, engage in or maintain, any condition or activity which, in his judgment, will result in or is likely to result in imminent and substantial damage to the environment, or to public health within the jurisdiction of the commissioner under the provisions of chapters 440, 442, 445, 446a, 446c, 446d and 446k or whenever he finds after investigation that there is a violation of the terms and conditions of a permit issued by him that is in his judgment substantial and continuous and it appears prejudicial to the interests of the people of the state to delay action until an opportunity for a hearing can be provided, may, without prior hearing, issue a cease and desist order in writing to such person to discontinue, abate or alleviate such condition or activity. Upon receipt of such order such person shall immediately discontinue, abate or alleviate or shall refrain from causing, engaging in or maintaining such condition or activity. The commissioner shall, within ten days of such order, hold a hearing to provide the person an opportunity to be heard and show that such condition does not exist. Such order shall remain in effect until ten days after the hearing within which time a new decision based on the hearing shall be made."

in the first case, No. SW-258, commanded the defendants "to wholly and absolutely cease and desist from further disposal or transfer of solid waste" at the Conrail property.[7] On March 1, 1988, this order was made a final consent order as agreed by both the defendants and the commissioner. The order in the third case, No. SW-259, commanded the defendants "to correct [several] violations and to bring the [Conrail property] into full compliance with applicable statutory and regulatory requirements," in accordance with a remedial schedule established by the commissioner.[8]

In April, 1988, public hearings, at which the defendants appeared, were held concerning order No. SW-259; see General Statutes § 22a-225 (b);[9] after

[7] Order No. SW-258 stated that: (1) the defendants were "operating a solid waste land disposal and/or transfer facility located at 1 Singer Avenue, Bridgeport, Connecticut, on property owned by [Conrail] and on water and sewer easements controlled by" United Illuminating Company; (2) the defendants' activities could "reasonably be expected to discharge pollutants to and adversely affect the quality of ground and surface waters of the state, pose a fire hazard or provide rodent harborage"; (3) damage to United Illuminating Company's water main would result in the closure of the Bridgeport Harbor power generating station, curtailing electrical power to 110,000 customers; and (4) a sewer line servicing the power generating station had been damaged and repaired, but the defendants' activities jeopardized the repaired line.

[8] Noting the conditions at the Singer Avenue site, order No. SW-259 stated that the defendants were: (1) "operating a solid waste land disposal and/or transfer facility" at the Singer Avenue properties; (2) operating that facility without the required permits, in violation of § 22a-209-4 of the Regulations of Connecticut State Agencies and General Statutes § 22a-208a (a), (b) and (c); and were violating the prohibition against open dumping contained in § 22a-209-2 of the Regulations of Connecticut State Agencies.

[9] General Statutes § 22a-225 (b) provides: "Unless a person aggrieved by an order files a written request for a hearing before the commissioner within thirty days after the date of issuance, such order shall become effective. If requested, the commissioner shall hold a hearing as soon thereafter as practicable. A request for a hearing shall be a condition precedent to any appeal. The commissioner may, after the hearing or at any time after the issuance of his order, modify such order by agreement or extend the time scheduled therefor if he deems such modification or extension advisable or necessary, and any such modification or extension shall be deemed

which an adjudicator in the department of environmental protection made written findings of fact and conclusions of law, determining that: (1) the defendants had "operated and maintained without a permit, a bulky solid waste land disposal facility and transfer station" at the Singer Avenue property; (2) in order to protect United Illuminating Company's water and sewer lines, it was necessary that "the bulky waste and solid waste deposited on the [Conrail property] by the [defendants] must be removed . . . with all due diligence and as soon as practical to safeguard the health, safety, and welfare of the people of this state"; and (3) removal of the "unauthorized waste" would require "the full cooperation of both Conrail, as the site's owner, and [United Illuminating Company] as a holder of rights of way." On the basis of these conclusions, the adjudicator, on July 14, 1988, affirmed the commissioner's prior order and commanded that the defendants "[i]mmediately stop and do not resume waste disposal and/or waste transfer operations" at the Conrail property or at the property leased by the defendants. In addition, the final order; see General Statutes § 22a-225 (c);[10] set forth a comprehensive compliance schedule requiring the defendants to remove the waste deposited on the Conrail property.[11]

---

to be a revision of an existing order and shall not constitute a new order. There shall be no hearing subsequent to or any appeal from any such modification or extension."

[10] General Statutes § 22a-225 (c) provides: "After hearing, the commissioner shall consider all supporting and rebutting evidence and affirm, modify or revoke such order in his discretion and shall so notify the recipient of the order by certified mail, return receipt requested."

[11] The compliance schedule, as established by the adjudicator, provided that the defendants take the following actions: "1. Immediately stop and do not resume waste disposal and/or waste transfer operations at the Conrail Property or at the Cavalleri Property. . . .

"3. Within fifteen days of the issuance of this order, commence the removal of all solid waste remaining on the Conrail Property, provided that any activity of any sort on the portion of the Conrail Property on which

On the basis of the evidence presented at a trial conducted in December, 1988, and January, 1989, the court found ample support for the commissioner's conclusion that the defendants' activities at the Singer Avenue properties would "give rise to imminent and substantial damage to the environment or to [the] public health." In both cases, the court concluded that the defendants had violated the terms of the orders issued by the commissioner. In fact, the court noted, the defendants' violations of both orders had been "flagrant." The court ordered, therefore, in the first case, that the defendants: (1) "refrain from the further disposal or transfer of solid waste at the Conrail Property . . . and on water and sewer easements," under

the United Illuminating Company has easements shall only take place if the provisions of Paragraph I (8) of this final order are followed. . . .

"5. Complete removal of all waste on top of the surface of the Conrail Property no later than October 1, 1988. . . .

"7. Provide at least 24 hours written notice to the Solid Waste Management Unit of the Department of Environmental Protection, Consolidated Rail Corporation and United Illuminating Company of any day on which waste removal activities are to take place.

"8. Any activity of any sort on the portion of the Conrail Property on which United Illuminating Company has easements shall take place under the on site supervision of a registered professional engineer in order to insure that it is conducted in a manner that does not present any risk to the water or sewer lines running underneath such portions of the Conrail Property, except as otherwise specifically provided by this paragraph. In lieu of using the registered professional engineer retained pursuant to paragraph I (2) for on-site supervision, staff designated by the United Illuminating Company may be utilized if United Illuminating Company wishes to designate staff for such purpose, although this order is not requiring any such designation by United Illuminating. If the registered professional engineer, or staff designated by the United Illuminating Company, is not present on the Conrail Property, no activity on the portion of the Conrail Property on which the United Illuminating Company has easements shall take place under any circumstances. . . .

"10. A report shall be submitted to the Solid Waste Management Unit of the Department of Environmental Protection such that the report is received by the Solid Waste Management Unit no later than 4:30 p.m. on the last Friday of each month following the issuance of this order detailing all actions taken to fulfill the requirements of this order."

a civil penalty of $100,000; (2) "pay to the State of Connecticut, in accordance with [§ 22a-226] . . . the sum of $10,000 for each day of violation, beginning March 11, 1988," a period of twenty-five days; and (3) pay a civil penalty of $50,000 rather than $250,000 if orders entered in the case were timely complied with and if the solid waste was removed from the Conrail property within five months from the date of the judgment, April 24, 1989. The court ordered, in the third case, that the defendants: (1) comply with the final order, with minor exceptions, of the commissioner; (2) "desist and refrain from threatening, interfering with or intimidating, or attempting to threaten, interfere with, or intimidate, [any] officer, agent, or employee of the State of Connecticut or of United Illuminating Company"; (3) pay a civil penalty, pursuant to § 22a-226, of $500,000, "for the period beginning September 22, 1988, when the appeal from [order No. SW-259] was dismissed";[12] and (4) pay a civil penalty of $75,000 rather than $500,000 if all orders entered in the first and third cases were timely obeyed. Having ordered the defendants, in the first case, to cease further disposal or transfer of solid waste on the Conrail property, the trial court, in the third case, ordered that the defendants immediately "stop and do not resume waste transfer operations" at the Singer Avenue property leased by them.

The defendants have appealed from both of these decisions, claiming that the trial court: (1) erred in concluding that their conduct violated the final administrative orders issued by the commissioner; and (2) abused its discretion by ordering that the defendants perform remedial measures and pay civil penalties,

---

[12] The defendants had initiated an administrative appeal from the commissioner's final order. See General Statutes § 22a-225 (e). That appeal was dismissed by the Superior Court, on September 22, 1988, "due to a procedural irregularity," according to the defendants.

without properly considering their financial ability to do so. The commissioner has cross appealed in both cases, claiming that the trial court erred: (1) in the third case, by vacating a prior contempt finding for violation of a temporary injunction made in a prior proceeding in the Superior Court; (2) by making the civil penalties in both cases conditional, dependent upon further action by the defendants; and (3) in the third case, by failing to order the removal of demolition debris from the Singer Avenue property leased by the defendants.

A

The defendants first argue that the trial court erred in concluding that they had violated the terms of the final orders issued by the commissioner. In the first case, the defendants assert that the trial court could not have properly concluded that they had operated a "solid waste land disposal and/or transfer facility" on the Conrail property after March 1, 1988, the date of the original consent order, since: (1) the trial court's ruling in the fifth case, that the debris placed on the property was deposited only on a temporary basis, "conclusively established the non-existence of a 'solid waste disposal area' on the Conrail property"; and (2) "the evidence was grossly insufficient to prove the operation of a transfer station on Conrail's property." In the third case, the defendants assert that: (1) the evidence presented at trial was insufficient to establish the operation of a "solid waste land disposal and/or transfer facility," after July 13, 1988, the date of the commissioner's final order in that case; and (2) to the extent that the imposition of civil penalties was based on the defendants' failure to perform remedial measures contained in order No. SW-259, the trial court's decision was erroneous since the defendants were prevented, by virtue of an injunction in a related federal case, from entering the Conrail property.

The commissioner counters these arguments by asserting that: (1) mere "[p]roof that waste was disposed of or transferred justifie[d] an injunction enforcing the [consent] order" in the first case; (2) the issue of whether the defendants had operated a solid waste disposal area or transfer station was effectively established by the final administrative decisions in each case; (3) the evidence was sufficient in both cases to establish that the defendants had operated a "solid waste land disposal and/or transfer facility"; and (4) performance of the remedial measures ordered by the commissioner was not impossible.

### 1

"As a general proposition, the governing principle is that administrative adjudications have a preclusive effect when 'the parties have had an adequate opportunity to litigate.' *United States* v. *Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S. Ct. 1545, 16 L. Ed. 2d 642 (1965)." *Convalescent Center of Bloomfield, Inc.* v. *Department of Income Maintenance,* 208 Conn. 187, 195, 544 A.2d 604 (1988); *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 318, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973). "[A] valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court." 2 Restatement (Second), Judgments § 83 (1). "Our rules of res judicata are based on the public policy that 'a party should not be allowed to relitigate a matter which it already has had an opportunity to litigate.' *In re Juvenile Appeal (83-DE),* 190 Conn. 310, 318, 460 A.2d 1277 (1983) . . . ." *Duhaime* v. *American Reserve Life Ins. Co.,* 200 Conn. 360, 363–64, 511 A.2d 333 (1986). "Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually

litigated and necessarily determined in a prior action between the same parties upon a different claim." *In re Juvenile Appeal (83-DE),* supra, 316; see *Orselet* v. *DeMatteo,* 206 Conn. 542, 544–46, 539 A.2d 95 (1988); *Duhaime* v. *American Reserve Life Ins. Co.,* supra, 364–65.

Applying these principles, particularly those of collateral estoppel, to the facts of these cases, it must first be noted that in regard to both orders, the defendants have had an adequate opportunity to litigate the issue of whether their activities were encompassed within the statutory definitions of a "solid waste facility"; General Statutes § 22a-207 (4); or a "transfer station"; Regs., Conn. State Agencies § 22a-209-1;[13] as claimed by the commissioner. In both cases, the orders of the commissioner specifically stated that the defendants were "operating a solid waste land disposal and/or transfer facility." In the first case, the defendants, foregoing an opportunity to contest the commissioner's order, entered into a final consent order, agreeing to be ordered "to wholly and absolutely cease and desist from further disposal or transfer of solid waste" at the Conrail property. Such an order, just like a stipulated judgment or consent decree, will be given preclusive

---

[13] Section 22a-209-1 of the Regulations of Connecticut State Agencies provides in part: " 'Transfer station' means a volume reduction plant, as defined by Section 22a-207 of the General Statutes, as amended, that is a central collection point for the solid waste generated within a municipality or group of municipalities, where solid wastes received are transferred to a vehicle for removal to another solid waste facility."

General Statutes § 22a-207 (5) provides: " 'Volume reduction plant' means a plant having the capacity to process in excess of two thousand pounds per hour of waste material input, which plant is designed primarily for the purpose of reducing the volume of solid waste which must finally be disposed of, including but not limited to incinerators, pulverizers, compactors, shredding and baling plants, transfer stations, and compost plants or other plants which accept and process refuse for recycling, reuse and resource recovery." This statute was amended, effective July 1, 1989, by No. 89-386 of the 1989 Public Acts.

effect "to the same extent as a judgment or decree rendered after answer and contest." *Gagne* v. *Norton,* 189 Conn. 29, 31, 453 A.2d 1162 (1983); *Connecticut Water Co.* v. *Beausoleil,* 204 Conn. 38, 48–49, 526 A.2d 1329 (1987). In the third case, the defendants appeared at the hearing held by the commissioner, which resulted in a final order finding that the defendants had "operated and maintained without a permit, a bulky solid waste land disposal facility and transfer station" on the Conrail property, and directing that the defendants "stop and do not resume waste disposal and/or waste transfer operations at the Conrail Property or at the [property leased by the defendants]."[14]

Since the defendants had consented to, or abandoned their opportunity to challenge, the commissioner's initial conclusion that their activities constituted operation of the proscribed facilities, the sole question to be answered by the trial court was whether the activities prohibited by the orders continued after their issuance by the commissioner. Recognizing that the issue of whether the defendants' past behavior constituted a violation of the relevant statutes had been determined between the parties under the doctrine of collateral estoppel, the trial court noted "that the final order of the plaintiff does not forbid the operation of the waste facility as such. Rather, it requires that the defendants 'stop and do not resume waste disposal and/or transfer operations.' " Providing further amplification while hearing the commissioner's motion for a temporary injunction in the third case, the court stated that the commissioner's order "means just what it means in plain English, without reference to any statute. In other words, it's to stop doing what he's doing. That's about it." The court also concluded that "by use of the words

---

[14] The defendants concede that they are unable to attack this finding directly, their administrative appeal from the final order having been dismissed by the Superior Court.

waste disposal and/or waste transfer operations, is meant the dumping of demolition debris on the . . . property [leased by the defendants], and processing it and transferring it to other locations. Any one of those things would constitute a violation of this order." The trial court was entirely correct in this conclusion, since, quite simply, these defendants were, before the trial court, foreclosed from contesting the commissioner's determination that their activities prior to the orders were in violation of the applicable statutes and regulations. See *Connecticut Water Co.* v. *Beausoleil,* supra, 45; *Conservation Commission* v. *Price,* 193 Conn. 414, 428–29, 479 A.2d 187 (1984); *Water Resources Commission* v. *Connecticut Sand & Stone Corporation,* 170 Conn. 27, 30–33, 364 A.2d 208 (1975). The question becomes, therefore, whether the trial court had before it evidence that the defendants did "[a]ny one of those things" prohibited by the orders after the dates on which the commissioner's orders became final.[15]

In the first case, order No. SW-258 stated that the defendants were engaged in "landfilling and/or transfer operations" on the Conrail property. These statements were further amplified in order No. SW-259, which stated that "[d]emolition waste has been deposited over an area of [the] Conrail property measuring approximately one acre in size. The height of the waste above the elevation of Singer Ave. varies from approximately 8 feet to 25 feet deep, and waste has also been placed below the original grade of the property into virgin soil."[16] It is in relation to these activi-

[15] Those dates were March 1, 1988, the date of the consent order in the first case, and July 13, 1988, the date of the commissioner's final order in the third case. See *Preisner* v. *Aetna Casualty & Surety Co.,* 203 Conn. 407, 414, 525 A.2d 83 (1987); *Salem Park, Inc.* v. *Salem,* 149 Conn. 141, 144, 176 A.2d 571 (1961).

[16] In addition to the allegations contained in order No. SW-259, the DEP adjudicator made the following factual findings after the hearing conducted in this matter: "8. At various times between August 26, 1986 and March 4,

ties that we must review the evidence presented at trial, in order to decide whether the court was justified in determining that the defendants had violated the terms of the commissioner's prior orders.

First, the defendants stipulated, at a postjudgment hearing relating to the court's imposition of conditional civil penalties, that, even fifteen months after issuance of the final order in the third case, they were "not in compliance . . . with each and every one of [the] ten [remedial] terms" set forth in the order and incorporated, with minor changes, into the trial court's judgment in that case. Second, the trial court concluded that the defendants' activities in each case had been in "flagrant" violation of the commissioner's final orders. In response to the defendants' motions for articulation, the court indicated that these conclusions were based, in the first case, on its own viewing of the Conrail property as well as the testimony of a detective from the

---

1988, metal, wood, tires, cans, glass, pieces of iron, pipes, plastic, wall plasterboard, demolition debris, concrete, and porcelain fixture pieces were deposited fairly evenly on the Conrail site. By January 28, 1988, about one acre of the Conrail Site contained this type of material.

"9. Sometime between January and March, 1988, large amounts of the material, as noted above, on the Conrail site were removed from the south side of the Conrail property. . . .

"15. During a seven month period, a Connecticut police detective identified a majority of the trucks dumping debris on the Conrail site as belonging to the [defendants]. He testified that at least 3 to 4 times per day for 25–30 days over a seven month period demolition debris was placed in the site. . . .

"22. Mr. Thomas Cappozziello testified at the hearing, among other things, that:

"A. he had deposited debris on the Conrail property . . . .

"D. debris from the Terra Mar Hotel was deposited by his company on the [property leased by the defendants]."

On the basis of these and other factual findings, the DEP adjudicator concluded that the defendants had "operated and maintained without a permit, a bulky solid waste land disposal facility and transfer station at 1 Singer Avenue, Bridgeport on property owned by Conrail and on water and sewer easements held by [United Illuminating Company] . . . ."

state police department. That detective offered testimony from which the court could have concluded that the defendants both discarded and removed debris from the Conrail property "several times during each day," when he had observed their activities on at least twenty-eight weekly occasions after March, 1988.

In the third case, the court indicated that its conclusion rested upon evidence cited in a memorandum provided by the commissioner in response to the defendants' motion. That memorandum referred to another witness, who had given testimony indicating that the defendants had deposited and removed debris from both the Conrail and the defendants' leased property on a "fairly continuous" basis from February, 1988, until the summer of 1988. Further, the memorandum summarized testimony from which the court could have concluded that the defendants, between December 12, 1988, and February 17, 1989, had placed debris on their leased property in an amount sufficient to cover one quarter of the parcel to a depth of twenty-five to thirty feet. The memorandum also noted that the defendants had not, as of May 30, 1989, begun any of the remedial measures contained in the commissioner's final order, citing the defendant Cappozziello's testimony that he did not "believe [he] answered the clean up orders . . . ."

We conclude, on the basis of our review of the evidence cited, that the trial court was entirely justified in ruling that the defendants had violated the terms of both orders issued by the commissioner.

2

The defendants next argue that the trial court's decision in the third case is erroneous to the extent that the penalties imposed were based on the defendants' failure to perform the remedial measures set forth in the commissioner's final order. The defendants assert

that they were prevented from accomplishing those clean up measures by virtue of an injunction in a federal case brought by Conrail, prohibiting the defendants from entering the Conrail property. Thus, the defendants argue, since "[t]he inability of a party to obey an order of the court, without fault on his part, is a good defense to the charge of contempt"; *Mallory* v. *Mallory,* 207 Conn. 48, 57, 539 A.2d 995 (1988); civil penalties should not have been imposed on them for their failure to carry out the remedial orders.

The injunction on which the defendants rely was issued by a United States District Court judge on February 18, 1988, and ordered, "on consent," that the defendants were "enjoined from *trespassing* or encouraging others to *trespass* on plaintiff's property, or from digging, dumping demolition debris and other materials . . . on plaintiff'[s] property . . . ."[17] (Emphasis added.) The order contains absolutely nothing prohibiting the defendants from entering the Conrail property in order to remove debris that they had previously dumped there, and in fact, in its proposed form, had required that the defendants do precisely that. That clean up order was deleted, however, when the injunction was actually issued by the federal judge.[18] Further, the defendants do not explain how they could be trespassers on the Conrail property, if they entered under the authority of the commissioner's final order, No. SW-259, or with the consent of Conrail.

The commissioner's final order commanded Conrail, as well as United Illuminating Company, which were

---

[17] *Consolidated Rail Corporation* v. *Bridgeport Wrecking Co.,* United States District Court, District of Connecticut, Docket No. B88-870509 (February 18, 1988).

[18] One excised portion of the proposed injunction stated: "[A]nd requiring the defendants or some of them to remove the debris previously dumped, including soil containing debris, to replace said soil with clean fill and to restore the property to its general configuration as it [existed] prior to defendants' dumping and digging."

parties to the administrative and trial proceedings, to give just such consent. That order provided that "[Conrail] and the United Illuminating Company are each ordered to assist in the correction of the violations addressed in this proceeding by allowing [the defendants] access to the Conrail Property for the *limited purpose of carrying out actions required by this order.*" (Emphasis added.) Even if this argument concerning the federal court injunction had been presented at trial, it was implicitly rejected by the court's verbatim adoption, in its judgment in the third case, of this portion of the commissioner's final order. Further, testimony presented to the court indicated that Conrail sought only to prevent the further dumping of debris on its property and did not oppose entry to remove the debris that was already there.[19] It is axiomatic that entry upon property with permission of the owner, absent subsequent acts of abuse, is a defense to a claim of trespass. See General Statutes § 53a-110;[20] *Kellogg* v. *Robinson,* 32 Conn. 335, 342 (1865).

This claim is without merit.

## B

The defendants next argue that the trial court abused its discretion in both the first and third cases, by ordering that they perform remedial measures as ordered by the commissioner and pay civil penalties in the amount of $750,000 should those measures not be car-

---

[19] An attorney employed by Conrail testified that she had attended a number of settlement meetings at which Cappozziello was present, and responded affirmatively when asked, by counsel for the defendants, whether she had "requested that the [Conrail] property be cleaned up?"

[20] General Statutes § 53a-110 provides in part: "It shall be an affirmative defense to prosecution for criminal trespass that . . . (3) the actor reasonably believed that the owner of the premises, or a person empowered to license access thereto, would have licensed him to enter or remain, or that he was licensed to do so."

ried out, or $125,000 if they were.[21] The defendants assert that the court "erred first, by failing to make factual findings to support the conclusion that the defendants possessed the financial ability to implement the remedial provisions of [order No.] SW-259 before imposing fines; and second, by failing to determine whether the defendants possessed the financial ability to pay any fines in any of the cases before it." According to the defendants, the court should have made factual findings conforming to the three factors set forth in 33 U.S.C. § 1321 (b) (6) (A);[22] see *United States* v. *General Motors Corporation,* 403 F. Sup. 1151 (D. Conn. 1975); prior to the imposition of penalties in these cases.

In General Statutes § 22a-208, the legislature has directed the commissioner to "administer and enforce the planning and implementation requirements" of our solid waste management statutes, chapter 446d. In addition, the commissioner "shall examine all existing or proposed solid waste facilities and provide for their proper planning, design, construction, operation, monitoring, closure and postclosure maintenance . . . ." General Statutes § 22a-208. In order to prevent damage to our environment, "[t]he commissioner shall order the alteration, extension, limitation, closure or replacement of such facilities whenever necessary . . . ." General Statutes § 22a-208. The defendants do not contest the commissioner's ability to impose remedial measures under her broad statutory author-

[21] Since it is not clear from the defendants' brief, we will assume that they challenge both the higher and lower penalties imposed by the trial court.

[22] Title 33 of the United States Code, § 1321 (b) (6) (A) provides in part: "In determining the amount of the penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the owner or operator charged, the effect on the owner or operator's ability to continue in business, and the gravity of the violation, shall be considered by such Secretary." This section of the United States Code is entitled "Oil and hazardous substance liability."

ity. They do argue, however, that the cost of any remedial actions ordered must be considered before the court may impose civil penalties pursuant to General Statutes § 22a-226, which authorizes the imposition of a penalty "not to exceed ten thousand dollars per day," or injunctive relief against those who violate a final order of the commissioner. The defendants do concede that § 22a-226 "vests wide discretion in the court since it is notably silent on the factors which must be considered by the court in deciding what a fair and proper civil penalty might be in any given situation." The defendants assert, nevertheless, that at the time of trial, it was "manifestly clear that any substantial penalty or fine imposed by the court in this case, given the company's financial condition, would render the business insolvent."

This court has not had prior occasion to rule upon the financial implications of civil penalties and injunctive relief imposed under our solid waste management statutes. In the absence of further guidance from the legislature, we find persuasive, although not binding, the authorities cited to us by both the defendants and the commissioner. We conclude that when trial courts are asked to impose penalties pursuant to § 22a-226 they are to be guided in the exercise of their discretion by considering such factors as those set forth in 33 U.S.C. § 1321 (b) (6) (A), as well as by the two general goals set forth in the Civil Penalty Policy; Env. Rptr. (BNA) p. 41:2991-93; of the federal Environmental Protection Agency. See *Chesapeake Bay Foundation* v. *Gwaltney of Smithfield,* 611 F. Sup. 1542, 1556–57 (E.D. Va. 1985), aff'd, 791 F.2d 304 (4th Cir. 1986), vacated on other grounds, 484 U.S. 49, 108 S. Ct. 376, 98 L. Ed. 2d 306 (1987). Those factors include, but are not limited to: (1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of

the violation; (4) the good faith efforts made by the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of future violations; and (7) the fair and equitable treatment of the regulated community. See 33 U.S.C. § 1319 (d) (Cum. Sup. 1989);[23] *Pirg* v. *Powell Duffryn Terminals, Inc.,* 720 F. Sup. 1158, 1160 (D.N.J. 1989); *United States* v. *Environmental Waste Control, Inc.,* 710 F. Sup. 1172, 1242–45 (N.D. Ind. 1989); *United States* v. *T & S Brass & Bronze Works, Inc.,* 681 F. Sup. 314, 322 (D.S.C. 1988).

Applying these factors to these cases, we first note that the trial court made the following relevant findings. In its memorandum of decision in the second case, the court noted that the individual defendant had "been very active, and his work has included jobs that have added up to large sums of money. His records that were presented indicated that not everything was reflected in them, and that they were incomplete. Also, he failed to produce a copy of his 1986 income tax return even though he had been ordered to do so. His explanation as to this was not satisfactory. It is noted also that when he was previously fined for contempt, the court observed that the sum of $3500 per day was set so as to make a further violation unprofitable. However, this failed to deter the defendant." The court also found that "[t]here was evidence presented as to Mr. Capozziello's acts or threats of violence toward members of the plaintiff's staff. This conduct, while not bearing directly upon the merits, affected his credibility." While

[23] Title 33 of the United States Code (Cum. Sup. 1989), § 1319 (d) provides in part: "In determining the amount of a civil penalty [for specified violations of the federal Clean Water Act] the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require."

the court noted that the individual defendant was "hard-working . . . his questionable testimony, his intimidation of witnesses and his disregard for the order of the court greatly affect[ed] his credibility." As noted previously, the court also found that the defendants had "flagrantly" violated both of the orders issued by the commissioner.

The defendants have not sought further articulation of the factual basis underlying the court's imposition of injunctive relief and civil penalties in these cases. See Practice Book § 4051. "The correctness of a judgment of a court of general jurisdiction is presumed in the absence of evidence to the contrary. We do not presume error. The burden is on the appellant to prove harmful error." *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 7, 513 A.2d 1218 (1986); *DiBerardino* v. *DiBerardino,* 213 Conn. 373, 385, 568 A.2d 431 (1990). In the absence of further articulation of its reasoning "it would be sheer speculation for this court to assume that the trial court applied the incorrect legal standard." *State* v. *Crumpton,* 202 Conn. 224, 232, 520 A.2d 226 (1987); *DiBerardino* v. *DiBerardino,* supra. Since there was ample evidence before the trial court to justify the imposition of both remedial measures and substantial penalties, the defendants have not satisfied their burden of proving that the trial court failed to consider the defendants' financial condition prior to rendering judgment in these cases.

We conclude, therefore, that the trial court did not err in ordering injunctive relief in the form of remedial measures or the imposition of civil penalties in the amount of $750,000. Although the defendants' ability to continue in the building demolition business was one factor for the court to consider, that factor alone should not be given overriding weight in the face of "flagrant" and repeated violations of our solid waste management statutes. Not only did the defendants fail to comply with

the orders issued by the commissioner, but they also continued this behavior even after the trial court had imposed penalties for contempt in the amount of $3500 per day. Further, the trial court heard testimony that the individual defendant had attempted to intimidate, offered to fight, attacked, and threatened to kill persons employed by the commissioner to investigate the subject matter of these cases. Under these circumstances, we conclude that the defendants' ability to continue in the building demolition business was given its proper perspective in light of the other relevant factors we have set forth.

## C

In her first issue on the cross appeal, the commissioner argues that the trial court erred in the first case by vacating a previous order of the court, *Freed, J.,* finding the defendants in contempt of a temporary injunction issued by the court, *Shaughnessey, J.* The court, *Hon. John M. Alexander,* state trial referee, concluded that Judge Freed had held the defendants in contempt for behavior that was not within the scope of the temporary injunction issued by Judge Shaughnessey. Specifically, Referee Alexander noted that it was undisputed that the defendants had been found in contempt for activities that had taken place on the Singer Avenue property leased by the defendants for their demolition operations. Concluding that the temporary injunction had referred to only the Conrail property, and that it was "apparent that Judge Freed was not made aware of this oversight," Referee Alexander concluded that "fairness and accuracy require[d] that [he] should intervene." The commissioner claims, however, that the temporary injunction included the property leased by the defendants, that Judge Freed was indeed aware of the arguments concerning the scope of the injunction, and that "[Referee] Alexander construed the language of the injunction much more nar-

rowly . . . . " The commissioner contends that this issue should have been controlled by the law of the case, and that Referee Alexander, therefore, should have deferred to the ruling made by Judge Freed.

"The law of the case is not written in stone but is a flexible principle of many facets adaptable to the exigencies of the different situations in which it may be invoked." *Breen* v. *Phelps,* 186 Conn. 86, 99, 439 A.2d 1066 (1982). "Where a matter has previously been ruled upon interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance." Id. "A judge should hesitate to change his own rulings in a case and should be even more reluctant to overrule those of another judge. . . . Judge shopping is not to be encouraged and a decent respect for the views of his brethren on the bench is commendable in a judge. Nevertheless, if the case comes before him regularly and he becomes convinced that the view of the law previously applied by his coordinate predecessor was clearly erroneous and would work a manifest injustice if followed, he may apply his own judgment." Id., 99–100; see *Texaco, Inc.* v. *Golart,* 206 Conn. 454, 458, 538 A.2d 1017 (1988); *Rosenblit* v. *Danaher,* 206 Conn. 125, 132–33, 537 A.2d 145 (1988); *Mac's Car City, Inc.* v. *American National Bank,* 205 Conn. 255, 259–60, 532 A.2d 1302 (1987).

The temporary injunction issued by Judge Shaughnessey, on March 3, 1988, ordered the defendants "to wholly and absolutely desist and refrain from disposal or transfer of solid waste at 1 Singer Avenue . . . on property owned by [Conrail] and on water and sewer easements controlled by the United Illuminating Company . . . . "[24] The commissioner concedes that the

[24] The temporary injunction stated that the property in question was "described on the Bridgeport City Assessor's records as being bordered

property description contained in the temporary injunction is virtually identical to the description of the property on which the commissioner found the defendants were engaged in prohibited activities, which is contained in the final consent order entered in the first case. The commissioner also concedes that "Judge Freed held the defendants in contempt for conduct wholly" on the property leased by them, but argues, nevertheless, that the specific language of the injunction is not controlling since order No. SW-258 was entitled: "In the matter of an order to cease and desist unlawful disposal of solid waste on land known as 1 Singer Avenue, Bridgeport, Connecticut, and on adjacent land owned by the Consolidated Rail Corporation." The commissioner claims that this title of the order encompassed both the Conrail property and the property leased by the defendants, and that it was this description which Judge Freed considered when he found the defendants to be in contempt.

In support of this contention, the commissioner refers us to testimony given by the individual defendant before Judge Freed on October 31, 1988, that the property known as 1 Singer Avenue consisted of both the Conrail property and the property leased by the defendants.[25] That testimony does not, however, assist the

by the Calia property (Map 5-5, Block 542, Lot 57) to the north, the Cavalleri property (Map 5-5, Block 528, Lot 1X) and Mauerzall property (Map 5-5, Block 542, Lot 7) to the south, the United Illuminating property (Maps 5-14 and 5-15, Block 542, Lot 22B) to the east and Singer Avenue to the west . . . . " It is undisputed that this description indicates only the Conrail property and not the property leased by the defendants.

[25] The commissioner relies upon the following testimony of the individual defendant:

"Q. Mr. Capozziello, does that [photograph] represent 1 Singer Avenue as it existed on January 22nd, 1988?

"A. No.

"Q. What's different about it?

commissioner, since it was accepted by all those involved that the Singer Avenue site consisted of two parcels, the Conrail property and the property leased by the defendants, but that the behavior for which the defendants were found to be in contempt had occurred on the leased property.[26] Contrary to the commissioner's assertion that Judge Freed was aware of the differing property descriptions in the injunction and the heading of her order, our review of the transcript from the contempt hearing reveals that Judge Freed was never alerted to the fact that "1 Singer Avenue," as used in the temporary injunction, referred only to the Conrail property. In fact, Judge Freed specifically stated: "As I read the injunction the defendants are restrained from disposal or transfer of solid waste *at 1 Singer Avenue*" (emphasis added), which according to the testimony he had heard referred to *both* the Conrail property and the leased property. Judge Freed was never informed that the temporary injunction actually included just the Conrail property within its commands.

An injunction "should be clear and certain in its terms, so that the party upon whom it is served may readily know what he can or cannot do thereunder, seeing that the consequences of a breach may subject him

---

"A. That property to your right there was involved with Conrail, which is fifty percent cleaned up at this time. And the property to the left belongs to the Cavalleris, which I'm occupying at this time which I have a screener on and that property is clean. And that's why I'm here today, because of the Cavalleri property. You're trying to incorporate Conrail with Cavalleri property to make your case stronger."

The Singer Avenue property leased by the defendants was referred to below as the Cavalleri property, using the name of its owners.

[26] The court did hear testimony, at the contempt hearing, from one witness concerning dumping on the Conrail property. That testimony referred, however, to one truck, which the witness was not able to associate with the defendants. Further, there is no indication that the court, in finding eight violations of the temporary injunction, relied on any behavior of the defendants other than that which had occurred on their leased property.

to loss of property . . . . " *Baldwin* v. *Miles,* 58 Conn. 496, 502, 20 A. 618 (1890); *Palverari* v. *Finta,* 129 Conn. 38, 40, 26 A.2d 229 (1942); *Robinson* v. *Clapp,* 65 Conn. 365, 396, 32 A. 939 (1895); *Rogers Manufacturing Co.* v. *Rogers,* 38 Conn. 121, 125 (1871). The particular things forbidden by an injunction are "to be determined from the terms of the injunctive order, read in view of the relief sought and the issues made in the case before the court which rendered it, and it will be given neither a wider nor a narrower scope than is warranted by such construction." 42 Am. Jur. 2d., Injunctions § 337; *Baldwin* v. *Miles,* supra, 498–99. In this case, however, regardless of whether "Judge Freed's decision reflected the intent of the initial order that was carried into the final order and the injunction enforcing it," as contended by the commissioner, the fact remains that the injunction, though using some language contained in the commissioner's original order, specifically enjoined the defendants from activities only on the Conrail property.

Under these circumstances the doctrine of the law of the case is patently inapplicable, since Judge Freed was never asked to rule upon the scope of the property description contained in the temporary injunction. See *Rosenblit* v. *Danaher,* supra, 133. Rather, Judge Freed's decision reflects only his understanding that: (1) the defendants were prohibited from dumping or transferring solid waste at 1 Singer Avenue; (2) 1 Singer Avenue was comprised of both the Conrail property and the property leased by the defendants; and (3) the defendants had violated the terms of the injunction only by engaging in the prohibited activities on the Singer Avenue property leased by them, not the Conrail property. Referee Alexander, in turn, correctly concluded that Judge Freed's finding of contempt was plainly wrong, on the basis of the simple fact that the proof

did not meet the prohibition of the injunction limited to the Conrail property, and that this had not been brought to the court's attention. Cf. *Sanchez* v. *Warden,* 214 Conn. 23, 37, 570 A.2d 673 (1990) (no abuse of discretion in setting aside judgment based upon ground not raised during prior trial).

### D

In her initial brief on the cross appeals in the first and third cases, the commissioner argued that the trial court erred by ruling that the amount of the civil penalties would be conditional, depending upon the defendants' compliance with orders entered by the court as well as their removal of the solid waste from the Conrail site within five months of the date judgments were rendered in these cases, April 24, 1989. The commissioner now claims that this issue is moot, the trial court having already concluded that the conditions imposed by the judgments were not satisfied by the defendants.

The judgment in the first case imposed civil penalties in the amount of $250,000, to be reduced to $50,000 "if the defendants compl[ied] with the orders entered in [that] case and if they also remov[ed] the solid waste from the Conrail Property within five months" from the date of judgment. Similarly, the judgment in the third case imposed civil penalties in the amount of $500,000, to be reduced to $75,000 if the "defendants timely obey[ed] all of the orders of the court entered in this case and in [the first case]." On September 27, 1989, the commissioner filed motions in each case, requesting that the court rule that the conditions established in the judgments had not been met by the defendants. At a hearing conducted on October 27, 1989, the defendants stipulated that none of the clean up orders entered in either case had been complied with. The

court accepted the stipulation and stated that it would hear argument on the commissioner's motions on November 17, 1989.

In the interim, the defendants filed applications for a nunc pro tunc order in each case, "applying retroactively to April 24, 1989, staying judgments entered . . . pending a final determination of appeals of [those] judgments . . . ." At the hearing conducted on November 17, 1989, the defendants withdrew any claim that the prohibitory commands of the judgments should be stayed, and limited their request to one which would have stayed the running of the five month conditional period until this court had resolved the then pending appeals in these cases. Later in the hearing, however, the defendants limited their request even further, "asking that [the proposed stay] apply to the imposition of penalties, and really to nothing else," since the penalties imposed "would simply—a business that would—would just be wiped off the face of the earth with that type of—with that type of a fine imposed." In response to United Illuminating Company's concern that the five month conditional clean up period was also going to be stayed, the defendants confirmed the court's understanding that it was "not going to grant this stay as it appl[ies] to the mandatory order," and the court concluded, consequently, that the defendants would "start in to clean up, and whether they do or not, *at least the order isn't going to be changed—altered.*" (Emphasis added.) In light of the fact that they made "no attack on either the prohibitory or mandatory provisions of the . . . injunctions," since they would be "crazy to try," the defendants concluded their presentation at the November 17, 1989 hearing by requesting that the court "grant the motion determining that the condition for reducing the penalty in [both cases had] not been met."

The court subsequently issued two memoranda of decision, the first noting that "[i]t has been stipulated and the Court finds that the conditions in the judgment permitting the Reduction of a Portion of the civil penalty have not been met." In the second, the court concluded that the defendants had asked for "the stay only as it relates to the *imposition of a penalty or penalties*. [They do] not seek a stay as to the other orders, including the prohibitory and mandatory orders of the judgment." (Emphasis added.) Recognizing that its order involved the possibility of both irreparable harm to the defendants and potential harm to the public as well as the other parties in these cases, the court concluded that the postponement of "the infliction of monetary penalties until the appeal is resolved will not unduly cause harm" to the interests involved. The court ordered, therefore, that the defendants' request for stays of the judgments be granted "only as [they involve] *the question of monetary penalties;* it is DENIED as to the remaining orders." (Emphasis added.)

During oral argument before this court, counsel for the defendants stated that it was his understanding of the trial court's ruling on the stay of execution that the time period for completion of the remedial measures would not begin to run until this court had issued a final determination of the various appeals and cross appeals in these cases. Although comments made by the trial court, during the hearing on the commissioner's motions, tend to undercut this understanding, the fact remains that the memorandum concerning the stay of execution does not specifically answer the question of whether the five month conditional period was to be stayed pending appeal. Nor does the memorandum specifically impose the $750,000 civil penalty, with only collection to be stayed pending the outcome of these

appeals. Rather, the court ordered that stays be granted only in relation to "the question of monetary penalties."[27]

"An articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification." *State* v. *Wilson,* 199 Conn. 417, 435, 513 A.2d 620 (1986); *Rostain* v. *Rostain,* 213 Conn. 686, 694–95, 569 A.2d 1126 (1990). Such an articulation is especially appropriate when, as in these cases, the payment of an additional $625,000 in civil penalties hangs in the balance. We conclude, therefore, that the question of whether this claim is moot depends entirely on whether the five month clean up period was to commence on April 24, 1989, the date of the judgments, or on the date that this court issues its opinion. If the date of judgment is controlling, the commissioner's claim is moot, while if the date of this opinion is controlling, the defendants may still be able to avoid payment of the higher civil penalty. Since the answer to this question is not specifically contained in the memorandum of decision on the stay, we remand this case, sua sponte, for further articulation of the stay order of the court. *Rostain* v. *Rostain,* supra, 695.

On remand, the trial court must answer the following question. After consideration of the defendants' application for stays of execution, did the court stay the commencement of the five month period during which the defendants could have satisfied the clean up orders entered in the judgments, or did the stay of execution encompass only the actual payment of $750,000

---

[27] The actions and decision of the trial court are somewhat more ambiguous in light of the fact that actual payment of the civil penalties was subject to an automatic stay of execution; Practice Book § 4046; while the injunctive relief would have continued in effect pending the outcome of these appeals unless the trial court, upon application, ordered that it be stayed. General Statutes § 52-477; *Hartford Federal Savings & Loan Assn.* v. *Tucker,* 192 Conn. 1, 7, 469 A.2d 778 (1984).

in civil penalties? If commencement of the five month conditional period *was not stayed,* the court will enter orders requiring the defendants to make payment of the full amount of the civil penalties imposed in each case. If, on the other hand, the commencement of the five month conditional period *was stayed* by the court, this court, having supervision of a case on appeal; *Rostain* v. *Rostain,* supra; will fully consider the commissioner's claim of error. The trial court's articulation should be promptly filed with the clerk of this court for our review.

### E

In her final claim on the cross appeal in the third case, the commissioner argues that since the defendants violated her final order in that case, by depositing demolition debris on their leased property on Singer Avenue after the close of evidence at trial, the court erred by not ordering the defendants to remove the debris, as the court had done in the first case in relation to the debris located on the Conrail property. We conclude that this issue is moot.

The commissioner submitted, nearly three months after the close of evidence, a motion for leave to amend her complaint. The amendment requested that the court order the defendants "to remove the solid waste deposited at [their leased property] in violation of the final decision and order [of the commissioner] . . . and deposit it in a manner authorized by law . . . ." At a hearing conducted by the trial court on April 17, 1989, the commissioner argued that her original complaint in this case did not include a request that the court order the defendants to remove debris from their leased property, for the simple reason that there was not a significant amount of debris on that property until after the completion of the trial. Consequently, when it became apparent to the commissioner that debris was

being placed on that property, she asked to amend her complaint in the manner specified.

In response to the commissioner's request, the court concluded that, because the final order, No. SW-259, issued by the commissioner prohibited only the disposal or transfer of solid waste on the defendants' leased property, and did not order the removal of any such debris, the court was limited to the terms of that order and could not require the defendants to remove whatever debris they had placed there subsequent to the issuance of the order.

Before discussing the merits of this issue, we must address a jurisdictional matter raised by the commissioner. In her initial brief, the commissioner informed us that as of September 28, 1989, the date the brief was filed, the defendants' leased property had been cleared of demolition debris.[28] The absence of any evidence that the defendants have deposited debris on their leased property after September 28, 1989, raises the question of whether this issue is moot, in which case this court would be deprived of jurisdiction over the dispute, since we are powerless to issue advisory opinions. *Westport* v. *State,* 204 Conn. 212, 217, 527 A.2d 1177 (1987); *State* v. *Hope,* 203 Conn. 420, 424–25, 524 A.2d 1148 (1987); *Reply of the Judges,* 33 Conn. 586 (1867). The commissioner, however, relying upon *Shays* v. *Local Grievance Committee,* 197 Conn. 566, 499 A.2d 1158 (1985), argues that we should address this issue since it is " 'capable of repetition, yet evading review.' " Id., 573.

To the extent that the commissioner's claim of error depends upon the court's failure to order the removal

---

[28] Neither the commissioner nor the defendants, in their subsequent briefs have provided us with any further details concerning events after September 28, 1989, although counsel for the defendants did inform us that there were no activities occurring at Singer Avenue at the time of oral argument.

of debris placed on the defendants' leased property after the close of evidence in this case, that issue is truly moot since we can give the commissioner no practical relief. Quite obviously, the defendants cannot be ordered to remove debris that is already gone. See *Hallas* v. *Windsor,* 212 Conn. 338, 348, 562 A.2d 499 (1989); *Waterbury Hospital* v. *Connecticut Health Care Associates,* 186 Conn. 247, 249–50, 440 A.2d 310 (1982). Further, to the extent that the commissioner seeks a determination from this court that the trial court *could have,* on the basis of the commissioner's final order, required the removal of debris from the defendants' leased property, that issue, while possibly capable of repetition, would not evade review. We note that on April 24, 1989, seven days after the court's oral ruling on the commissioner's motion to amend her complaint, the court rendered its judgment in this case. That judgment included an order that the defendants comply with the entire final order of the commissioner and "stop and do not resume waste transfer operations" on their leased property. Future violations of this order, should any occur, would constitute a basis for a contempt of court proceeding; see *Cologne* v. *Westfarms Associates,* 197 Conn. 141, 150, 496 A.2d 476 (1985); the punishment for which is within the sole discretion of the trial court; *Rogers Manufacturing Co.* v. *Rogers,* supra, 123; and "should be adapted and determined . . . with regard chiefly to the circumstances, character, and extent of the violation"; *Lawton* v. *Herrick,* 83 Conn. 417, 428, 76 A. 986 (1910); within the court's power to fashion equitable remedies. See *E. M. Loew's Enterprises, Inc.* v. *International Alliance,* 127 Conn. 415, 418–19, 17 A.2d 525 (1941). We conclude, therefore, that the issue of whether the defendants should have been ordered, at the April 17, 1989 hearing, to remove the demolition debris deposited on their leased

property after trial, but removed some time prior to September 28, 1989, is moot.

## II

In the second and fourth cases, the court concluded that the defendants had "dumped" demolition debris in the towns of Trumbull and Ansonia, in violation of § 22a-250 (c).[29] Both cases involved the defendants' agreement with private land owners allowing the defendants to place demolition debris, generated in the course of their business operations, upon the owners' properties. In the second case, the defendants claimed that they had no knowledge of the operation in Trumbull, and in both cases asserted that demolition waste was not included within the prohibitions set forth in § 22a-250 (c) and also that, in any event, that subsection was inapplicable to their actions since they had obtained the permission of the land owners prior to commencing their activities.

In its memoranda of decision in these cases, the court found that: (1) there was "ample evidence proving that the defendant was well aware of the operation" involving the Trumbull property; (2) the disposal of demolition waste was included within the definition of "litter," as that term is defined in General Statutes § 22a-248 (4)[30] and, therefore, constituted "dumping" as that term is defined in General Statutes

---

[29] See footnote 5, supra.

[30] General Statutes § 22a-248 (4) provides: " 'Litter' means any discarded, used or unconsumed substance or waste material, whether made of aluminum, glass, plastic, rubber, paper, or other natural or synthetic material, or any combination thereof, including, but not limited to, any bottle, jar or can, or any top, cap or detachable tab of any bottle, jar or can, any unlighted cigarette, cigar, match or any flaming or glowing material or any garbage, trash, refuse, debris, rubbish, grass clippings or other lawn or garden waste, newspaper, magazines, glass, metal, plastic or paper containers or other packaging or construction material which has not been deposited in a litter receptacle."

§ 22a-248 (12);[31] and (3) the defendants were liable for the imposition of fines, despite the fact that they had obtained permission of the property owners prior to depositing the demolition debris upon their properties, since "if the legislature [had] intended that the owner's agreement alone would exonerate, this circumstance would have been included as an exception" to the statute. The court found that dumping had occurred at the Trumbull property on at least twenty occasions and had occurred on at least fifteen occasions at the Ansonia property. On the basis of these findings, the court ordered, pursuant to General Statutes § 22a-250 (e),[32] that the defendants pay civil penalties of $8000 for the Trumbull violations and $9000 for the violations in Ansonia.

The defendants have appealed from these judgments, claiming that: (1) the court erred in the Trumbull matter by "relying on ambiguous, equivocal and speculative evidence to support" its factual finding that the defendants were "well aware of the [disposal] operation"; (2) § 22a-250 (c) is applicable only to "dumping" committed by trespassers and not those who "dump" with permission of the land owner; and (3) as applied in these cases, § 22a-250 is unconstitutionally vague, in violation of the defendants' right to due process of law. The commissioner has filed a cross appeal in both cases, claiming that the civil penalties imposed by the trial court were insufficient, "given the amount and scope of the dumping." We agree with the defendants' second contention and, therefore, need not address any of the other issues raised by the defendants or the commissioner.

[31] General Statutes § 22a-248 (12) provides: " 'Dump' means to discard (A) more than one cubic foot in volume of litter at one time or (B) furniture, automobiles or automobile parts, garbage bags or contents thereof or other similar materials."

[32] See footnote 5, supra.

Section 22a-250 (c) prohibits the dumping of any material, "upon private property in this state not owned" by the person dumping. Exceptions to this prohibition are provided when the activity occurs on property "designated by the state or any political subdivision thereof for dumping" and the person dumping is authorized to do so, or when the "property is a licensed facility" for dumping. General Statutes § 22a-250 (c). Since the defendants do not contest the court's finding that their activities were within the statutory definition of "dump" contained in § 22a-248 (12) and, further, do not claim that their activities were encompassed within one of the exceptions to § 22a-250 (c), we are confronted in these cases with the applicability of § 22a-250 (c) to situations in which "dumping" has occurred with the full knowledge and permission of the property owner.[33]

" 'Where the words of a statute fail to indicate clearly whether the provision applies in certain circumstances, it must be construed by this court . . . . ' *Board of Trustees* v. *Freedom of Information Commission,* 181 Conn. 544, 550, 436 A.2d 266 (1980). Under our rules of statutory construction, this court is to be guided by the language, purpose and legislative history of the statute in question." *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 405, 528 A.2d 805 (1987). Although § 22a-250 (c) clearly prohibits a person from "dumping" on land not owned by him without permission of the owner of that land, it is just as clear that civil penal-

---

[33] The commissioner argues that the defendants' claims regarding this issue are without merit, since the "property owners wanted clean fill. . . . [A]nd [they] did not authorize the dumping of demolition debris." Since the trial court concluded that whatever dumping had occurred had been done with the permission of the property owners in both cases, we will leave to those property owners any claims that they might have against the defendants for breaches of their agreements that resulted in demolition waste, rather than clean fill, being placed upon their property. See *Nye* v. *Marcus,* 198 Conn. 138, 141–42, 502 A.2d 869 (1985); *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 491–92, 400 A.2d 726 (1975).

ties cannot be imposed, at least under this statute, upon a person who "dumps" on his own property. The situation presented in these cases is not expressly dealt with in the statute, since the land in question was not owned by the defendants, but their activities took place with the consent of the owners. The legislative history associated with this statute is no more illuminating.

That history, as relied upon by the commissioner, reveals that § 22a-250 was amended by No. 87-531 of the 1987 Public Acts, to authorize civil penalties in the maximum amount of $10,000 for each violation of subsection (c), rather than the former penalties, limited to those provided for the commission of infractions of the law. See General Statutes § 51-164m.[34] The increased penalties, according to Representative Mary M. Mushinsky, were required since, "[a]s legal bulky waste dump sites have become more scarce, haulers are dumping in *vacant lots and off road areas* and small fines are no deterrent." (Emphasis added.) 30 H.R. Proc., Pt. 33, 1987 Sess., p. 12,072. Representative Mushinsky went on to state that the increased fine was "obviously intended for the major league haulers that have been flagrantly dumping and paying only a $99 penalty . . . which is no deterrent to them what-

[34] "[General Statutes] Sec. 51-164m. JUDGES TO ESTABLISH SCHEDULE OF FINES. (a) The judges of the superior court shall establish and maintain a schedule of fines to be paid for the violation of the sections of the general statutes deemed to be infractions and shall establish and maintain a separate sliding scale of fines for speeding infractions committed under section 14-219 with a minimum fine of thirty-five dollars and the fine increasing in proportion to the severity of the violation. The fines may be modified as the judges of the superior court deem advisable.

"(b) No fine established in accordance with the provisions of subsection (a) of this section may be less than thirty-five dollars or in excess of ninety dollars, except that fines established for parking tag violations and violations of subsection (c) of section 14-100a may be less than thirty-five dollars.

"(c) Any infraction for which a fine has not been established pursuant to the provisions of subsection (a) of this section shall carry a fine of thirty-five dollars until such time as the judges of the superior court may establish a different fine for such infraction."

soever. They, it is worth it for a hauler to dump several loads of bulky waste onto a vacant lot . . . . " Id., 12,084–85. This explanation of the impetus behind the increase in the maximum authorized penalty does not relate to the situation at hand. If any implication is to be drawn, it is that the increased penalty was to be applied to haulers who dump without the permission of the land owner. There is no indication from the legislative history cited by the commissioner that § 22a-250 (c) was intended to apply to those who "dump" with the permission of the land owner.

The commissioner also argues that § 22a-250 (c) is a remedial statute, "designed to benefit the people of the State of Connecticut by preventing pollution," and, therefore, "should be liberally construed to accomplish [its] purpose." *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 57, 441 A.2d 68 (1981). While we agree with the general proposition that environmental protection statutes are to be liberally construed, in these cases we are presented with the equally persuasive principle that as a penal law; see *Caldor's, Inc.* v. *Bedding Barn, Inc.,* 177 Conn. 304, 316, 417 A.2d 343 (1979); § 22a-250 (c) must be strictly construed against the state and in favor of the accused. *State* v. *Mattioli,* 210 Conn. 573, 579, 556 A.2d 584 (1989). In interpreting the statute, we must "assume that a reasonable and rational result was intended by the promulgating legislature." *Windham First Taxing District* v. *Windham,* 208 Conn. 543, 553, 546 A.2d 226 (1988). Further, "[t]he unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." *State* v. *Campbell,* 180 Conn. 557, 563, 429 A.2d 960 (1980).

The trial court's interpretation of § 22a-250 (c) could lead to completely unreasonable results in its applica-

tion, both to these defendants as well as to other persons who "dump" with the consent of the respective land owners. The court's conclusion, that the legislature would have specifically excluded from the operation of § 22a-250 (c) persons dumping with the permission of the land owner had it intended to do so, is one step beyond the relevant inquiry in this regard. While ordinarily, "the express mention in a statute of one exemption precludes reading others into it"; *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128 (1948); it must first be shown that the particular behavior in question is included within the activities prohibited by the statute. Cf. *Hammer* v. *Lumberman's Mutual Casualty Co.,* 214 Conn. 573, 589, 573 A.2d 699 (1990) (before the need for an exclusion arises, there must first be coverage within the defined scope of the insurance policy in question). Taken to its logical conclusion, the court's interpretation of § 22a-250 (c) would subject persons to civil penalties of up to $10,000 for merely assisting a land owner to "dump" upon his own property when no penalty could be imposed if the owner performed the same activity himself. It would be unreasonable to construe the exclusion for dumping by the owner to apply only when he performed the physical acts involved and to hold that it did not extend to those he had engaged to transport material to his land, such as his servants, agents or others, like the defendants, authorized to do so. The commissioner has not presented any reasonable basis for concluding that the intention of the legislature in excluding from § 22a-250 (c) dumping activities conducted by the owner was limited to those he performed personally and did not apply to the same deeds of other persons acting under his authority. The relevant history and language of this statute do not suggest that the legislature intended such an unreasonable result.[35]

---

[35] We note that the commissioner is not without remedies when confronted with situations like those presented in these cases. It would appear that

We conclude, therefore, that § 22a-250 (c) was not intended to be applied to those who "dump" on land with the full knowledge and consent of the property owner. Since that is precisely what transpired in these cases, the court erred in imposing civil penalties upon the defendants.

### III

In the fifth case, the commissioner alleged that the defendants had violated § 22a-250 (c) by "dumping" demolition debris on the Conrail property and the property leased by the defendants. The trial court concluded, despite the fact that the defendants had not obtained the permission of the property owners prior to placing debris on the property, that the defendants had not engaged in "dumping," as that term is utilized in § 22a-250 (c) and defined in § 22a-248 (12).[36] The commissioner has appealed from this judgment, claiming that: (1) the court erred by failing to give preclusive effect to a final order issued by the commissioner, in which it had been determined "that the defendants operated a solid waste disposal facility at the Conrail property, and that it was therefore the location utilized for the ultimate disposal of wastes"; (2) the court erred by construing § 22a-250 (c) to require proof of an intent to leave the demolition debris on the Conrail property permanently; and (3) the activities of the defendants were encompassed within the word "dump," as specified in § 22a-250 (c).

The court found the following relevant facts. After the defendants had demolished a building it was neces-

---

actions such as those taken against the defendants' Bridgeport activities would be warranted, albeit directed against the property owner, whenever more than five tons a year of solid waste is disposed of on a particular parcel of land without satisfaction of the applicable statutory and regulatory requirements. See General Statutes §§ 22a-207 (3), (4) and (6), 22a-208a and 22a-208b.

[36] See footnote 31, supra.

sary for them to dispose of the resulting debris. Since the cost of placing the debris in a legally certified land-fill was very high, the defendants transported it from the various job sites to the properties on Singer Avenue, where it was kept until a place was found for its ultimate disposal. The defendants made no claim that they had acquired permission of the owners of the two Singer Avenue properties prior to placing such debris upon their land. The evidence was "irrefutable" that over the time period in question, the debris remained at Singer Avenue for a time and was later transported to other locations. For example, the debris that was deposited on the property in Trumbull; see part II of this opinion; had been transported there from the Singer Avenue properties.

On the basis of these facts, the court concluded that § 22a-250 (c) had not been violated by the defendants, since it could not be concluded "that the defendants intended to keep the debris at Singer Avenue permanently." The court reasoned that "in order to 'dump,' one must necessarily 'discard' some forbidden object." See General Statutes §§ 22a-250 (c) and 22a-248 (12). Since the evidence showed that "when the material was deposited at [the Conrail property by the defendants,] it was done only on a temporary basis, and that the final act of discarding it did not take place until it was removed elsewhere," the court concluded that the defendants had not violated § 22a-250 (c).

## A

The commissioner first argues that the court erred by not giving preclusive effect to her determination, contained in final order No. SW-259, that the defendants had "operated and maintained without a permit, a bulky solid waste land disposal facility and transfer station" on the Conrail property. The commissioner contends that, since the court also concluded, in the

third case, that the defendants had operated a solid
waste facility at Singer Avenue and because such a
determination necessarily included a finding that the
Singer Avenue properties were "the location utilized
for ultimate disposal of wastes"; see General Statutes
§§ 22a-207 (4) and (6);[37] the court could not have logi-
cally concluded in this case that the Singer Avenue
properties were not utilized for the ultimate disposal
of the debris placed there by the defendants.

When presented with this seeming inconsistency, by
means of a motion for articulation, the court reiterated
that it had not been shown, in this case, that the defend-
ants intended to keep the debris at Singer Avenue on
a permanent basis. Recognizing that this finding was
at odds with its finding in the third case, that the
defendants had operated a solid waste disposal facil-
ity, the court concluded that in the third case it had
"found a number of reasons to sustain the Commis-
sioner's order, any one of which would [have been] suf-
ficient." The court concluded that its finding of the
operation of a solid waste disposal area "was only one
of the reasons," and that it was "questionable whether
[it] was a valid reason." Consequently, the court
adhered to its ruling that "the evidence did not estab-
lish the intent to keep the debris on the Conrail [prop-
erty] permanently."

We have concluded, in part I, A, 1 of this opinion,
that final orders promulgated by the commissioner are
to be given preclusive effect when issues finally
resolved, during the administrative process that
resulted in the order, are sought to be relitigated dur-
ing subsequent enforcement proceedings before the

---

[37] General Statutes § 22a-207 (4) provides in part: " 'Solid waste facil-
ity' means any solid waste disposal area . . . ." This statute was amended,
effective July 1, 1989, by No. 89-386 of the 1989 Public Acts.

General Statutes § 22a-207 (6) provides: " 'Solid waste disposal area'
means the location utilized for ultimate disposal of wastes."

Superior Court. In applying this principle to this case, however, the commissioner overlooks the fact that the final order on which she relies concluded that the defendants' activities on the Singer Avenue properties constituted both a "bulky solid waste land disposal facility *and* transfer station . . . . " (Emphasis added.) We agree with the defendants that these findings, in relation to the same operative facts, are mutually exclusive, since, contrary to the finding of "ultimate disposal" necessary for the operation of a "solid waste facility," the operation of a "transfer station," as defined by § 22a-209-1 of the Regulations of Connecticut State Agencies and General Statutes § 22a-207 (5),[38] specifically contemplates that the solid waste will be "transferred to a vehicle for removal to another solid waste facility." Regs., Conn. State Agencies § 22a-209-1. Further, there is nothing in the record indicating that the issue of the final resting place of the debris deposited on the Singer Avenue property was necessarily litigated in the administrative proceedings conducted by the commissioner. See *In re Juvenile Appeal (83-DE),* 190 Conn. 310, 316–17, 460 A.2d 1277 (1983); 1 Restatement (Second), Judgments § 27. In fact, the commissioner's conclusion that the defendants had operated *both* a solid waste disposal facility and a transfer station would indicate that resolution of the question whether the deposit of the Singer Avenue debris was transitory in nature was unnecessary for the orders issued by the commissioner as a result of the administrative proceedings.

Quite understandably, the commissioner does not rely upon the preclusive effect of the court's conclusion, in the third case, that the defendants had operated a solid waste disposal facility on the Singer Avenue property. "For a judgment to operate as res judicata and be conclusive evidence of a fact sought to be established by

---

[38] See footnote 13, supra.

it, it must appear that the fact was a material or essential one, and that the judgment could not have been rendered without deciding the matter." 46 Am. Jur. 2d, Judgments § 423. Thus, "the general rule is that the judgment in the former action . . . is not conclusive as to matters . . . which were not necessary to uphold the judgment." Id.; *Coit* v. *Tracy,* 8 Conn. 268, 276 (1830). Since the court later determined that it was "questionable" whether its finding, that the defendants had operated a solid waste disposal facility, was a valid reason for upholding the final order of the commissioner, we conclude that that finding was neither necessary to nor an alternate basis for the judgment rendered in the third case. See *State* v. *Ellis,* 197 Conn. 436, 463, 497 A.2d 974 (1985); *In re Juvenile Appeal (83-DE),* supra, 317; *Gionfriddo* v. *Gartenhaus Cafe,* 15 Conn. App. 392, 402, 546 A.2d 284 (1988), aff'd, 211 Conn. 67, 557 A.2d 540 (1989); 46 Am. Jur. 2d, Judgments § 427. Consequently, that finding could not have precluded relitigation of the issue of whether the Singer Avenue property was intended to be the final resting place of the debris transported there by the defendants.

B

The commissioner argues next that the court erred by injecting into the terms of § 22a-250 (c), a specific intent element requiring that there be proof of an intent to abandon waste permanently before there can be a violation of the statute. Quite simply, the commissioner argues that "[t]he statute involved in this appeal says do not dump. It does not say do not dump with an intent to permanently abandon the dumped material. No intent standard appears in the statute itself and none should be imputed." While we agree with the commissioner, that proof of a specific intent is not required in order to establish a violation of § 22a-250 (c), we are not convinced that the trial court rendered its decision

on this basis alone, and, consequently, conclude that the court did not err in rendering judgment in favor of the defendants.

Section 22a-250 (c) prohibits unauthorized "dumping" of certain materials. As the court correctly concluded, before one can "dump," one must first "discard" either a specified amount of "litter," or certain other specified items. General Statutes § 22a-248 (12).[39] The meaning of the term "discard," which is left undefined by the relevant statutory provisions, brings to the fore two principles of statutory construction. First, "in the absence of ambiguity, courts cannot read into statutes, by construction, provisions which are not clearly stated"; *Finkenstein* v. *Administrator,* 192 Conn. 104, 110, 470 A.2d 1196 (1984); and second, when left undefined by the legislature, "[t]he words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed." *Kilpatrick* v. *Board of Education,* 206 Conn. 25, 28, 535 A.2d 1311 (1988); see General Statutes § 1-1 (a).

Regarding the first of these canons of construction, we agree with the commissioner, that § 22a-250 (c) does not require that she shoulder any burden of proof on the issue of whether the alleged violator specifically intended to abandon the waste permanently at the time it was illegally "dumped." That does not, however, end our inquiry since the commissioner is required, by § 22a-248 (12), to present sufficient evidence from which the trier can conclude that the material "dumped" was also "discarded." Since the word "discard" is not defined within the relevant statutory scheme, we must ascertain what the commonly approved meaning of that term is. In the context of illegal dumping, the most common usage that comes

---

[39] See footnote 31, supra.

to mind is "throw away." The American Heritage Dictionary of the English Language (New College Ed.); see *American Mining Congress* v. *Environmental Protection Agency,* 824 F.2d 1177, 1184 n.7 (D.C. Cir. 1987). To say that "discard" means to "throw away" only further complicates the inquiry, since regardless of the term utilized, the intent of the alleged violator will always be relevant to the final determination of whether waste has been "discarded." Concluding that intent is relevant is not, however, the same as requiring proof of specific intent.

In this respect, the question of whether waste has been "discarded" is similar to the factors that will be considered when it has been claimed that property has been abandoned. Although, before legal abandonment can be found, there must be proof of an intent to abandon; *Glotzer* v. *Keyes,* 125 Conn. 227, 233, 5 A.2d 1 (1939); that requirement can be met without resort to proof of specific intent. "Most frequently, where abandonment has been held established, there has been found present some affirmative act indicative of an intention to abandon . . . but nonuser, as of an easement, or other negative or passive conduct may be sufficient to signify the requisite intention and justify a conclusion of abandonment. The weight and effect of such conduct depends not only upon its duration but also upon its character and the accompanying circumstances." Id.; *Sharkiewicz* v. *Lepone,* 139 Conn. 706, 707–708, 96 A.2d 796 (1953); *Sanchez* v. *Forty's Texaco Service, Inc.,* 5 Conn. App. 438, 440, 499 A.2d 436 (1985), cert. denied, 198 Conn. 803, 502 A.2d 932 (1986). Thus, rather than being obligated to prove that the defendants' "dumping" coincided with a specific intent to abandon what was "dumped," proof of "discarding" is sufficient when the totality of the evidence reveals that the alleged violator has "abandoned" or "thrown away" or "discarded" the material in ques-

tion for an indefinite period of time. We conclude that this inquiry does not require any in depth probing of the thought process of the alleged violator at the time of the "dumping."

Applying this standard to the facts of this case, we conclude that the trial court properly resolved this issue in favor of the defendants. While the commissioner relies entirely upon the court's finding that she had failed to establish "that the defendants intended to keep the debris at Singer Avenue permanently," the court also concluded "that when the material was deposited at Singer Avenue, it was done only on a temporary basis, and that the final act of discarding it did not take place until it was removed elsewhere." Thus, even if the court erred by placing upon the commissioner a requirement that she prove the specific intent of the defendants, there exists an alternate finding, utilizing the standard we have set forth above, that the defendants simply had not "discarded" demolition debris on the Singer Avenue property as required by § 22a-248 (12).[40]

## C

Finally, the commissioner asks this court to conclude, as a matter of law, that the defendants' actions at

---

[40] The concurring opinion suggests that we request the trial court for further articulation of "the manner in which the plaintiff failed to meet her burden of proof on the fifth cause of action," claiming that it is unclear "that the trial court concluded, or could have concluded, that the defendant had not 'discarded' the material in question for an indefinite period of time." The memorandum of decision, however, makes it clear that the court found this factual issue in favor of the defendants, concluding that the defendants always intended to move the material from the Singer Avenue location as soon as they found a place to discard it permanently, thus negating the commissioner's claim that the material had been deposited indefinitely at the Singer Avenue location. The trial court's conclusion is adequately supported by the evidence and quite clear: "On the factual issue presented in this case it is concluded that, when the material was deposited at Singer Avenue, it was done on a temporary basis, and that the final act of discarding it did not take place until it was removed elsewhere."

Singer Avenue constituted "dumping," and, therefore, violated § 22a-250 (c). On the basis of the evidence presented to the trial court, the commissioner now argues that "[s]urely several thousand tons of demolition debris deposited on the Conrail Property and left there undisturbed for over one year when the trial was concluded have been 'dumped' within the meaning of" § 22a-250 (c). While this might indeed be true in most cases, the simple answer to the commissioner's claim is that in this case the court concluded that it was not.

We have long held that "where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221, 435 A.2d 24 (1980). Our review of the court's memorandum, as well as the evidence presented, leads us to conclude that it did not err in ruling that the demolition debris placed on the Singer Avenue property was not "discarded" and, therefore, not "dumped." In light of our conclusion that "discarding," in relation to § 22a-250 (c), is to be determined on the basis of the totality of the circumstances presented, the size of the pile and the time it remains unmoved, while relevant, are not conclusive of the issue.

With respect to the defendants' appeals in the first and third cases, the judgments are affirmed. The issue of mootness regarding the imposition of conditional civil penalties, on the commissioner's cross appeals in the first and third cases, is remanded to the trial court for further articulation in accordance with this opinion. With respect to the defendants' appeals in the second and fourth cases, the judgments are reversed and the cases are remanded with direction to render judgments for the defendants. On the commissioner's appeal in the fifth case, the judgment is affirmed.

In this opinion CALLAHAN, COVELLO and HULL, Js., concurred.

PETERS, C. J., concurring. I agree with parts I and II of the opinion of the court. With respect to part III, I respectfully concur in the judgment.

Since a remand for articulation has been ordered on other grounds, I would have preferred to ask the trial court to articulate as well the manner in which the commissioner failed to meet her burden of proof on the fifth cause of action. The trial court concededly should not have imposed on the commissioner the burden of proving the defendants' specific intent to violate General Statutes § 22a-250 by "dumping" demolition debris on the Conrail property and the property leased by the defendants. It is unclear to me that the trial court concluded, or could have concluded, that the defendants had not "discarded" the material in question for an indefinite period of time. Even though the constituent elements of the mountain of dumped material may have changed over time, the total accumulation of demolition material continued throughout to be "tremendous," "unsightly" and a substantial danger to the environment. As a general matter, I am unpersuaded that the applicability of the "dumping" statute should turn on an atomistic a view of what has transpired here.

I nonetheless concur in the judgment because the trial court's decision may well have reflected an understandable reluctance to impose yet another sanction on the same conduct that had already been heavily sanctioned in the first and third cases. Although there are technical distinctions between the statutory bases for the various cases, the court might reasonably have concluded that enough is enough.

Accordingly, I respectfully concur.