[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Office of Consumer Counsel, seeks review of portions of two decisions rendered by the defendant, Department of Public Utility Control ("DPUC"), in its Docket No. 99-03-36, "DPUC Determination of the Connecticut Light and Power Company's Standard Offer." The court consolidated the above captioned appeals taken by OCC.
In 1998, the General Assembly enacted Public Act 1998, No. 98-28, "An Act Concerning Electric Restructuring", codified as General Statutes 16-244
et seq., seeking to shift the electric industry in Connecticut from the status of a regulated monopoly to open market competition. Under General Statutes § 16-244c(a)(1), Connecticut Light and Power Company ("CLP") is required to make an offering available to its customers beginning on January 1, 2000, called "the standard offer." It is to terminate on December 31, 2003 unless extended by legislative action. Under subsection (a)(2) of General Statutes § 16-244c, the standard offer is to be at least ten percent less than the rates in effect at the end of 1996. CT Page 13310
General Statutes § 16-244c(a)(2) also requires the DPUC to establish the standard offer as a contested case. Pursuant to the statute, CLP filed an application dated April 30, 1999, requesting the DPUC's approval of its proposed standard offer service and related rate components. After hearings and other proceedings, the DPUC issued an interim decision dated July 7, 1999. (Return of Record ("ROR"), Item XII-1, Interim Decision dated July 7, 1999 ("Interim Decision").)
The interim decision approved CLP's proposal to procure generation to serve standard offer customers fifty percent from competitive bidding and fifty percent from its affiliate Select Energy. It also addressed such issues as setting the Select Energy portion at the weighted average competitive bidding price, the need to have a percentage of energy generated from renewable sources, and ways to minimize any unfair advantage to Select Energy in the standard offer bid process. (ROR, Item XII-1, Interim Decision, p. 1.)
After further hearings, the DPUC announced its October 1, 1999 decision. (ROR, Item XII-2, Decision dated October 1, 1999, ("Decision").) The decision was described as setting the "framework" and the "parameters" for standard offer rates. (ROR, Item XII-2, Decision dated October 1, 1999, p. 97.) It discussed the seven components of the standard offer, including the competitive transition assessment ("CTA") that relates to an allowance to CLP for past nuclear investments. (ROR, Item XII-2, Decision, pp. 1-2.) Included in the decision was a section analyzing the interim nuclear capital recovery mechanism ("INCRM"), and an order requiring the filing of further cost data was entered in accordance with the discussion on this topic. (ROR, Item XII-2, Decision, p. 98.) The decision contemplated further refinement once this order was satisfied. (ROR, Item XII-2, Decision, p. 97.)
There were further hearings held after the issuance of the October decision. A supplemental decision dated December 15, 1999 was issued. (Supplemental Return of Record ("Supp. ROR"), Item VIII-1, Supplemental Decision dated December 15, 1999, ("Supplemental Decision").) The supplemental decision approved the CTA and made a modification of the INCRM in light of materials filed subsequent to the October decision. It did not change the methodology set forth in its October ruling, however. It also confirmed both Select Energy and the winning bidders, NRG Power Marketing, Duke Energy Trading and Marketing Northeast L.L.C., as each sharing half of the supply of energy for standard offer customers. (Supp. ROR, Item VIII-1, Supplemental Decision, p. 1.)
In response to a December 29, 1999 petition for reconsideration filed by CLP, relating to the calculation of recovery of nuclear capital additions, the DPUC reopened the standard offer docket to reconsider CT Page 13311 treatment of the post June 30, 1997 nuclear capital additions. On April 5, 2000, the DPUC issued a decision modifying the October and December decisions. (Supplement to the Certification of Record Docket No. 99-03-36RE01, Item IV-1, Decision dated April 5, 2000.)
The OCC has appealed from the decisions of July 7, 1999 and October 1, 1999.[1] CLP raises a subject-matter jurisdictional issue in these appeals, claiming that the OCC has not appealed from a final decision. Pursuant to the Uniform Administrative Procedure Act ("UAPA"), General Statutes § 4-183 (a): "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a finaldecision may appeal to the Superior Court as provided in this section." (Emphasis added.) CLP contends that the July 7, 1999 decision is an "interim decision" and was rendered before the auction was held or further hearings were held to determine the standard offer.[2] CLP also claims that the October 1, 1999 decision is not final because the decision did not complete the terms of the standard offer and in December 1999 and April 2000 revisions were made to the October 1, 1999 decision.
The court does not believe controlling what the DPUC called the decision — here the July 7, 1999 decision is called "interim" — or whether the words "interim" or "final" are used in the decision. In addition, a DPUC docket might have more than one final decision. Sections 4-181 a(b) and 16-9 of the General Statutes both contemplate that on changed conditions, the DPUC might issue another final decision after a first final decision has been issued.
What is a final decision depends on three factors: (1) does judicial review effect the orderly process of adjudication of the case; (2) do legal consequences flow from the decision; and (3) did the agency intend to issue a final decision? State v. State Employees' Review Board,231 Conn. 391, 402 (1994); see also Connecticut Bank Trust Co. v.CHRO, 202 Conn. 150, 155 (1987) ("The doctrines of finality and exhaustion of administrative remedies are designed to prevent piecemeal appeals of a litigant's claims before an administrative agency. . . .") (Citations omitted; internal quotation marks omitted.)
While CLP argues that Connecticut Natural Gas Corporation v. DPUC,1 Conn. App. 1 (1983) should affect the outcome of the issue of finality, the legislature through its 1988 amendments to the UAPA altered the precedential value of this case. it is now possible, for example, to have a final decision on certain issues that must be appealed at once and other issues subject to reconsideration and a later appeal. See SouthernNew England Telephone Company v. Dept. of Public Utility Control, Superior Court, judicial district of New Britain, Docket No. 502770 (January 3, 2001, Cohn, J.). CT Page 13312
Here, the OCC raises four issues arising out of the July 7, 1999 interim decision and one[3] from the October 1, 1999 decision. As presented by the OCC, the July 7, 1999 interim decision issues may be summarized as follows: (1.) the decision allows CLP to enter into affiliate business arrangements with Select Energy that incorporate anti-competitive features, contrary to the Act Concerning Electric Restructuring ("the Act"); (2.) the decision excuses Select Energy from any need to obtain the license required for electrical suppliers and electric aggregators, contrary to the Act; (3.) the decision holds the Act's renewable energy portfolio standards do not apply to standard offer power contrary to the requirements of the Act applicable to Select Energy; and (4.) the decision limits the scope of the code of conduct established by the Act contrary to its provisions.
It is alleged by the OCC that the October 1, 1999 decision incorrectly calculates the INCRM. This decision allegedly does not take into account "prudent and efficient" operations of a nuclear unit and adds a figure for post 1997 capital additions.
The court concludes that the July 7, 1999 and October 1, 1999 decisions are final decisions as to these issues. Southern New England TelephoneCo. v. Dept. of Public Utility Control, 64 Conn. App. 134, 139 (2001). When the DPUC promulgated these decisions, the DPUC had committed to the choice of Select Energy to share with the successful bidder or bidders in generating power for distribution by CLP. The future choices made the DPUC were shaped by the July 7, 1999 interim decision. It appears that the DPUC intended this decision to be a final decision on the topics of the appropriateness of choosing Select Energy. The October 1, 1999 decision notes that by the July 7, 1999 interim decision "the Department approved the Company's proposed supply plan with certain modifications." (ROR, Item XII-2, Decision, p. 3.)
The October 1, 1999 decision establishes the contours of the INCRM. While modestly altered in December 1999, the entire construct of the INCRM was in place due to the October 1, 1999 decision. (See Department of Public Utility Control Decision, Docket No. 99-02-05, July 7, 1999, p. 51) (indicating that the October decision was to consider these matters fully.) Therefore, the court denies CLP's motion to dismiss.
The questions presented in these administrative appeals involve the interpretation of statutes. As a standard of review, it is thus for the court "to expound and apply governing principles of law." (Citations omitted; internal quotation marks omitted.) Domestic Violence Services ofGreater New Haven, Inc. v. FOIC, 47 Conn. App. 466, 470 (1998); Office ofConsumer Counsel v. Dept. of Public Utility Control, 252 Conn. 115, 120
CT Page 13313 (2000).
It is true that "where, as in this case, the construction of the statute . . . has not previously been subjected to judicial scrutiny or to . . . a governmental agency's time-tested interpretation . . . that construction constitutes a question of law for which deference [to the agency] is not warranted. . . ." (Citations omitted; internal quotation marks omitted.) Southeastern Conn. Regional Resources Recovery Authorityv. DPUC, 244 Conn. 280, 290 (1998). At the same time, because this statutory scheme is intricate and complex, the court will approach its interpretation with due regard to the DPUC's views. Connecticut v. U.S.Dept. of Interior, 228 F.3d 82, 94 (2d Cir. 2000), cert. denied, ___ U.S. ___, 121 S.Ct. 1732, 149 L.Ed.2d 657 (2001) ("But even according less deference than usual, we would still take account of the agency's position . . .") (Citations omitted); Ross v. Giardi, 237 Conn. 550, 564
(1996) (seek agency's views where statutory scheme is most intricate);Ahern v. Thomas, 248 Conn. 708, 718-20 (1999).
Turning to the first issue raised by the OCC, the July 7, 1999 interim decision approves CLP's proposal to have its affiliate Select Energy provide fifty percent of the generation for the four year standard offer period. In that decision, the DPUC stated: "It is the view of the Department that CLP's proposal to provide 50% of its generation through Select and opening the second 50% to competitive bidding should promote a smooth transition to full competition when the SOS [standard offer supply] period ends. Furthermore, allowing Select to provide 50% of the SOS generation obligation promotes the consistency and stability the Department believes is needed during the SOS period as consumers adjust to the changes in generation suppliers." (ROR, Item XII-I, Interim Decision, p. 4.)
The OCC challenges this result. It contends that the Restructuring Act states a legislative purpose "to ensure an adequate and reliable power supply within the state and ensure development of a truly competitive generation market." General Statutes § 16-244 (7). According to the OCC, allowing a percentage of generation by Select Energy is anti-competitive; the bid process for the remaining fifty percent was tainted by the DPUC decision, and combining a bid and non-bid process diminishes competition. The DPUC's decision is allegedly anti-competitive in that it excuses Select Energy from having a statutorily mandated license or complying with a code of conduct; and that these exceptions apply only to Select Energy and not to those companies chosen through the bid process.
The OCC's argument fails for two reasons. First, the OCC's argument ignores the canon of statutory construction that the literal meaning of CT Page 13314 statutes should normally govern. State v. State Employees' Review Board, supra, 239 Conn. 654; 2A J. Sutherland, Statutory Construction (6th
Ed. 2000) § 46.06. "We presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions. . . ." (Citations omitted.) Hall v. Gilbert Bennett Mfg. Co., 241 Conn. 282, 303 (1997).
General Statutes § 16-244c(c) provides, in pertinent part, as follows: "Between January 1, 2000, and December 31, 2003, an electric distribution company may procure electric generation services through a competitive bidding process or through any of its generation entities or affiliates. On or after January 1, 2004, such company shall procure electric generation services through a competitive bidding process. Such company may procure electric generation services through any of its generation entities or affiliates, provided such entity or affiliate is the lowest qualified bidder and provided further any such entity or affiliate is licensed pursuant to section 16-245."
Thus, from the words of the statute, an electric distribution company, such as CLP, may always obtain electric generation from an affiliate, such as Select Energy.[4] On or after January 1, 2004, the affiliate must also be the lowest bidder and licensed. Prior to January 1, 2004, the additional conditions have not been imposed on the distribution company.
The legislature has specifically declared that CLP's choice of an affiliate prior to 2004 is permitted, and this has to take precedence over the general language of General Statutes § 16-244 (7) promoting competitiveness.
 It is well established that as a-matter of statutory construction, specific statutory provisions are presumed to prevail over more general statutory provisions dealing with the same overall subject matter. . . . State v. Champagne, 206 Conn. 421, 435, 538 A.2d 193 (1988); see also 2B J. Sutherland, Statutory Construction (5th Ed. 1992) § 51.02. It is an equally well established maxim that "in the absence of ambiguity, courts cannot read into statutes, by construction, provisions which are not clearly stated. Carothers v. Capozziello, 215 Conn. 82, 129, 574 A.2d 1268 (1990); see also 2A J. Sutherland, Statutory Construction (5th Ed. 1992) § 47.38.
(Internal quotation marks omitted.) Hallenbeck v. St. Mark the EvangelistCorporation, 29 Conn. App. 618, 624 (1992). CT Page 13315
Second, the fact that the legislature listed specific requirements for the use of affiliates for the period on or after January 1, 2004, that are absent for the period prior to January 1, 2004, indicates that the legislature intended that electric distribution companies could utilize an affiliate outside of the bidding process. As indicated above, the legislature is never presumed to enact mere surplusage. Leo Fedus SonsConstruction Co. v. Zoning Board of Appeals, 225 Conn. 432, 442 (1993). The court's interpretation of General Statutes § 16-244c(c) "allows for a complete reading of the statute that gives meaning to each independent clause. . . ." (Citations omitted.) State v. Murray,254 Conn. 472, 492 (2000).
The court further notes that subsequent to the July 7, 1999 interim decision, the DPUC issued two further decisions on October 1, 1999 and December 15, 1999. Hearings were held prior to these decisions to gauge whether any anti-competitive factors were affecting the bidding process or harming consumers. The OCC had full opportunity to participate in these proceedings.[5] In the December 15, 1999 decision, the DPUC declared: "The Department approves the results of the solicitation for competitive bidding. The competitive solicitation process was conducted in a manner that did not afford CLP's affiliates preferential treatment. The competitive solicitation was marketed aggressively to engender sufficient interest. Moreover, the competitive solicitation elicited a least cost solution to the procurement of SOS generation service." (Supp. ROR, Item VIII-1, Supplemental Decision, p. 3.) Thus, the administrative record does not support OCC's concerns as to anti-competitiveness.[6]
The OCC challenges the approval of Select Energy as a generation entity without requiring a license pursuant to General Statutes §16-244c(a)(1). As indicated above, the court's conclusion must follow the literal meaning of the words of the statutes. The relevant portion of General Statutes § 16-244c(a)(1) states: "While providing electric generation services under the standard offer, an electric distribution company may provide electric generation services through any of its generation entities or affiliates, provided such entities or affiliates are licensed pursuant to section 16-245." Section 16-245 (a) of the General Statutes forbids persons from executing any contract for electric generation services to end use customers "unless such person has been issued a license by the department in accordance with the provisions of this section."
Subsequent to the July 7, 1999 interim decision, Select Energy applied for and received a supplier license to end use customers retail customers. (See Department of Public Utility Control Decision, Docket CT Page 13316 No. 99-08-03, December 16, 1999; Department of Public Utility Control Decision, Docket No. 99-08-03REO1.) The OCC did not appeal from the proceedings issuing the license.
The OCC contends that the issue of the license is not moot because Select Energy has not been required to obtain a license in its role as supplier of energy to CLP. (Brief of the Plaintiff, Office of Consumer Counsel, p. 13.) The OCC relates that a requirement that Select Energy hold a license as a generator of electricity is a consumer protection provision and furthers competition. The OCC does not set forth any statute other than General Statutes § 16-245 mandating Select Energy to obtain a license. The court cannot impose a licensing requirement where there is no such statutory requirement.[7] Here, Select Energy has obtained the only license required by the Restructuring Act.
The third issue with the July 7, 1999 interim decision raised by OCC relates to the DPUC's treatment of renewable energy portfolio standards ("RPS"). The DPUC held that RPS does not apply to the standard offer and hence Select Energy does not have to meet RPS when supplying energy to CLP. The OCC claims that the DPUC's conclusion is in error, relying on legislative history that RPS applies to licensed entities. (Brief of the Plaintiff, Office of Consumer Counsel, p. 18.)
The court again must look to the specific language of the statutes to decide whether the DPUC has ruled correctly. General Statutes §16-245a(a) states that to be licensed under § 16-245 "an applicant for a license shall demonstrate to the satisfaction of the Department of Public Utility Control" that percentages of its total electrical output is generated from renewable energy sources. As seen in the prior discussion, General Statutes § 16-245 requires a license only for "end use customers."
Reading General Statutes § 16-245a in conjunction with General Statutes § 16-245, the court concludes that the RPS requirement has been imposed upon a generation entity providing energy to end use customers, that is retail customers.[8] Therefore, as the DPUC found, wholesale providers, such as Select Energy in this appeal, are not subject to RPS. This is the only logical conclusion to be derived from the statutory scheme. State v. Burns, 236 Conn. 18, 23 (1996) (in selecting correct interpretation, court should choose rational result that is effective in accomplishing the evident legislative intent). In addition, this result keeps in place the distinction in the cases between wholesale and retail suppliers of electricity. Connecticut Light PowerCo. v. DPUC, 219 Conn. 51, 60 (1991); Connecticut Light Power Co. v.Dept. of Public Utility Control, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 703777 (December 2, 1993, CT Page 13317 Maloney, J.); Connecticut Light Power Co. v. Dept. of Public UtilityControl, Superior Court, judicial district of New Britain, Docket No. 492697 (March 9, 1999, McWeeny, J.) (wholesale transactions are solely under the jurisdiction of the Federal Energy Regulatory Commission, not DPUC).
The OCC's final issue from the July 7, 1999 interim decision relates to the so-called code of conduct set forth in General Statutes § 16-244h. This code is intended, among other things, to assure "fair dealing between electric distribution companies and all other electrical suppliers . . . including any generation entities or affiliates of the electric company. . . ." General Statutes § 16-244h(b)(2). While the statute prohibits generation entities from conducting distribution operations, it also provides that "[t]he code of conduct shall not prohibit communications necessary for standard offer service pursuant to section 16-244c. . . ." General Statutes § 16-244h(b)(2).
In the July 7, 1999 interim decision, the DPUC applied the code of conduct to the bidding process to obtain the remaining fifty percent supply needed by CLP. (ROR, Item XII-1, Interim Decision, p. 6.) At the same time, the DPUC stated: "The Code of Conduct . . . applies to electric distribution companies, their generation entities or affiliates and electric suppliers, but does not apply to the relationship between the electric distribution companies and wholesale generators and entities that are not licensed electric suppliers."[9] (ROR, Item XII-1, Interim Decision, p. 9, ¶ 14.)
The OCC claims that the DPUC has, in finding of fact 14, indicated that it will not fully apply the code of conduct to Select Energy. The subsequent decisions of the DPUC do not bear out this contention. In the December 15, 1999 supplemental decision, the DPUC declared: "Since competitive bidding was open to CLP affiliates, fairness dictated strict adherence to the Code of Conduct. . . ." (Supp. ROR, Item VII-I, Supplemental Decision, p. 2.) The December 15, 1999 supplemental decision related the steps taken to "assure that preferential treatment of CLP affiliates did not occur during the bidding process. . . ." (Supp. ROR, Item VII-I, Supplemental Decision, p. 2.) On April 19, 2000, in the matter of an unconditional license for Select Energy, the DPUC considered an issue of Select Energy's obtaining customer information from CLP as well as issues surrounding sharing of officers, directors and employees. (Department of Public Utility Control Decision, Docket No. 99-08-03RE01, April 19, 2000, p. 3.)
In addition, a separate code of conduct docket was convened and a report issued showing that the DPUC was applying the code of conduct to both CLP and Select Energy. (Department of Public Utility Control CT Page 13318 Decision, Docket No. 99-12-09, April 19, 2000; see, e.g., p. 11, order of the DPUC that CLP and Select Energy terminate the sharing of planning activities.) There is no question that the code of conduct is being applied as required by General Statutes § 16-244h.
There are two issues raised by the OCC with regard to the October 1, 1999 decision, both of which concern the INCRM, an element of the CTA, a charge to consumers authorized by General Statutes § 16-245g. By way of background, in the July 7, 1999 "Stranded Costs Decision," the following appears: "The Company also proposes a mechanism and to recover or refund to customers the net difference in revenues and costs associated with operating the nuclear units after December 31, 1999, and until the units are sold." (Department of Public Utility Control Decision, Docket No. 99-02-05, July 7, 1999, p. 50.) A ruling on CLP's proposal was deferred because the DPUC was planning to have further hearings in the standard offer docket. (Department of Public Utility Control Decision, Docket No. 99-02-05, July 7, 1999, p. 51.)
In the October 1, 1999 decision, CLP's proposal was analyzed fully. While the proposal was not completely accepted, the DPUC stated that it would follow the legislative intent of freezing recovery for capital assets as of June 30, 1997, "while allowing only for the recovery of normal operation expenses from that point to divestiture."[10] (ROR, Item XII-2, Decision, pp. 2, 71.) This statement is the basis for the INCRM. In the December 15, 1999 supplemental decision, after making minor adjustments, the DPUC calculated the INCRM figures for the years 2000 and 2001. These figures were included in the CTA as stranded costs. (Supp. ROR, Item VIII-1, Supplemental Decision, pp. 9-10.)
While no specific statute uses the term INCRM or refers to an electric distribution company's operating costs during the interim period, there are references to this type of charge in the Restructuring Act. The CTA is partially defined in General Statutes § 16-245e(2)(B) as charges that are authorized by the department to recover those stranded costs not funded with the proceeds of rate reduction bonds or interim capital costs. Section 16-245g(d)(3) also states that the CTA includes an amount "to pay an electric company stranded costs that are not funded with the proceeds of rate reduction bonds. . . ." The DPUC has been given a legislative directive to regulate the activities of public utilities to the fullest extent in the public interest. General Statutes § 16-11
(referring to § 16-19 on the authority of the DPUC to set rates);Greenwich v. Department of Public Utility Control, 219 Conn. 121, 126
(1991). The INCRM was properly designed to support the safe operation of nuclear plants during the transitional period.
The OCC has not appealed from the DPUC's decision to establish the CT Page 13319 INCRM; rather it states in its supplemental brief of May 10, 2001, at pages 9, 20, that its challenge concerns the way in which the DPUC measured expenses against CLP's projected revenue for 2000 and 2001. In the draft decision at page 71, the DPUC stated that it would "apply a methodology similar to the Company's proposed cost/benefit sharing mechanism using the peer group analysis assumptions." (ROR, Item X-2, Draft Decision, dated September 21, 1999, p. 71.) In the decision of October 1, 1999, however, this language was changed to: "[T]he Department will apply a methodology similar to the Company's proposed cost/benefit sharing mechanism." (ROR, Item XII-2, Decision, p. 71.) "[T]he costs approved in the Rate Case Decision should be used in the computation of the income capitalization value portion of the nuclear interim capital recovery mechanism, rather than the proposed peer group mechanism." (ROR, Item XII-2, Decision, p. 71.) The OCC objects to change between the draft and the October 1, 1999 decision that no longer allows use of the peer group data in setting the INCRM.
The OCC states that the use of peer group data is mandated because the INCRM is found in General Statutes § 16-244g(e)(1) and this section directly refers to calculating costs under General Statutes §16-244g(c)(3). Section 16-244g(c)(3) of the General Statutes describes a "nuclear generation asset of comparable size, age and technical characteristics that is prudently and efficiently managed," that is, it calls for a "peer group mechanism." The OCC contends that the legislature intended use of peer group data and that the rate case decision does not meet the legislative goal of insuring that the electric distribution companies were not rewarded for imprudent management.[11]
The court has pointed out, however, that the INCRM is related to, but not the same as, the calculation to establish interim capital costs under General Statutes § 16-244g(e)(1). The DPUC created in the INCRM what even the OCC calls at page 40 of its original brief a "construct." As such, the DPUC was not required by General Statutes § 16-244g(e)(1) to use the methodology for expenses as set forth in General Statutes § 16-244g(c)(3) in establishing the INCRM.[12] As the DPUC explained in the October 1, 1999 decision: "In the Rate Case Decision, the Department approved OM costs for each nuclear unit that excluded the effects of the regulatory outages, and included only those costs that represented prudent operations. This is fair and more equitable to all parties than the peer group methodology, since the Company will receive necessary funds to operate the nuclear units; however, CLP is responsible for any expenses exceeding that amount." (ROR, Item XII-2, Decision, p. 71.)
This conclusion of the DPUC is not arbitrary or capricious or characterized by abuse of discretion. General Statutes § 4-183
CT Page 13320 (j)(6). It meets the standards of Connecticut Light Power Co. v. DPUC, supra, 219 Conn. 57-58: "With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.)
The final claim by OCC is that the INCRM is defective in allowing capital additions from a period after July 1, 1997, in violation of General Statutes § 16-245e(a)(7). There is no indication that the DPUC in either its October 1, 1999 decision or December 15, 1999 supplemental decision discussing the INCRM allowed for any post 1997 capital additions charges that would directly affect consumers. (See ROR, Item XII-2, Decision, pp. 70-72; Supp. ROR, Item VIII-1, Supplemental Decision, pp. 8-10.)[13] The only possibility of this type of recovery as part of mitigation was first raised in the April 5, 2000 decision, which the OCC has not appealed.
For the above-stated reasons, the appeals of the OCC are dismissed.
Henry S. Cohn, Judge